**Affirmed as Modified and Opinion filed October 11, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00742-CV

### SYLVIA YOLANDA ARREDONDO, Appellant,

### V.

### ANTONIO A. BETANCOURT, JR., Appellee.

**On Appeal from the 309th District Court**
**Harris County**
**Trial Court Cause No. 2002-05630**

## O P I N I O N

Sylvia Yolanda Arredondo appeals the trial court's May 31, 2011 order granting Antonio A. Betancourt, Jr.'s petition to modify the parent-child relationship. We affirm the judgment as modified.

I

Sylvia and Antonio married in January 2001, and Sylvia gave birth to their son in April of that year. The couple divorced in September 2002. In their agreed divorce

decree, Sylvia and Antonio were designated joint managing conservators of their child. Sylvia was awarded the exclusive right to establish the primary residence of the child without regard to geographic location. Antonio was awarded a standard possession order, which included a provision for alternative periods of possession if Sylvia and the child moved more than 100 miles from Antonio's residence. Antonio was also required to pay child support. In 2003, Sylvia married Miguel Arredondo, and they had a son.

On November 1, 2009, Sylvia drove to Mexico with her husband and two sons. Two days later, Sylvia sent a text message and email to Antonio telling him she and their child were in Mexico. At trial, Antonio claimed this was the first time he learned that Sylvia had taken their child to Mexico; Sylvia claimed Antonio knew well in advance that she planned to move to Mexico.

Shortly after Sylvia took the child to Mexico, Antonio filed a petition to modify the parent-child relationship. In his petition, Antonio sought to modify the divorce decree to award him the exclusive right to determine the child's primary residence, require Sylvia to pay child support, and obtain a temporary restraining order requiring Sylvia to return their child to Harris County. Antonio alleged that he was requesting the modifications because Sylvia "secretly fled the country with the child without notice." Sylvia filed a counter-petition requesting, among other things, that conservatorship be modified to designate her the sole managing conservator of the child. The trial court signed temporary orders requiring Sylvia to return the child to Harris County and awarding Antonio the exclusive right to designate the child's primary residence within the county. Sylvia was also ordered to surrender the child's passport to the trial court, and the court's order reflects that she surrendered the child's passport and "voluntarily" surrendered her own passport.

In April 2011, a jury trial commenced on the issues of which parent should have the exclusive right to determine the child's residence and whether a geographical restriction should be imposed. The jury determined that the decree should be modified to award Antonio the exclusive right to designate the child's primary residence with a

2

geographic restriction to Harris County and the contiguous counties. The trial court signed a judgment incorporating the jury verdict in Antonio's favor and, in addition, permanently enjoined Sylvia from traveling outside the continental United States without Antonio's prior written consent. The trial court also denied Sylvia's post-trial motion requesting that the court return her passport.

## II

In her first two issues, Sylvia contends that the evidence is legally insufficient to support modifying the decree to give Antonio the exclusive right to designate the primary residence of the child. Sylvia argues that because the divorce decree gave her the exclusive right to designate the child's primary residence without a geographic restriction, she was authorized to move to Mexico with the child and therefore the move alone cannot constitute a material and substantial change in circumstances warranting modification of the custody arrangement.

## A

Because a trial court has broad discretion to decide the best interest of a child in family-law matters such as custody, visitation, and possession, we review a trial court's order modifying conservatorship under an abuse-of-discretion standard. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or when it clearly fails to correctly analyze or apply the law. *See In re D.S.*, 76 S.W.3d 512, 516 (Tex. App.—Houston [14th Dist.] 2002, no pet.). In evaluating whether the decision constitutes an abuse of discretion, we note that a trial court may not contravene a jury verdict that determines which joint managing conservator has the exclusive right to designate the primary residence of the child. Tex. Fam. Code § 105.002(c)(1)(D).

Under the abuse-of-discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error, but are factors in assessing whether the trial court abused its discretion. *See In re D.S.*, 76 S.W.3d at 516. However, a jury's

3

findings underlying a conservatorship decision are subject to ordinary legal- and factual-sufficiency review. *Alexander v. Rogers*, 247 S.W.3d 757, 761 (Tex. App.—Dallas 2008, no pet.).

An appellate court will sustain a legal-sufficiency issue when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the trial court's exercise of discretion, we consider the evidence and inferences favorable to the finding if a reasonable fact finder could, and disregard evidence contrary to the finding unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Lenz v. Lenz*, 79 S.W.3d 10, 17 (Tex. 2002); *In re P.M.B.*, 2 S.W.3d 618, 621–22 (Tex. App.—Houston [14th Dist.] 1999, no pet.). We defer to the fact finder's resolution of underlying facts and to credibility determinations that may have affected its determination, and will not substitute our judgment for the fact finder's. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

B

To prevail on his petition to modify the parent-child relationship, Antonio had to establish that (1) modification would be in the child's best interest and (2) "the circumstances of the child, a conservator, or other party affected by the order has materially and substantially changed" since the date of the rendition of the 2002 divorce decree. *See* Tex. Fam. Code § 156.101(a)(1)(A). Here, Sylvia does not challenge the jury finding that the modification was in the child's best interest; she challenges only the finding of a material and substantial change in circumstances.

In deciding whether a material and substantial change of circumstances has occurred, a fact finder is not confined to rigid or definite guidelines; instead, the

4

determination is fact specific and must be made according to the circumstances as they arise. *In re A.L.E.*, 279 S.W.3d at 428. Material changes may include (1) the marriage of one of the parties, (2) poisoning of a child's mind by one of the parties, (3) change in the home surroundings, (4) mistreatment of a child by a parent or step-parent, or (5) a parent's becoming an improper person to exercise custody. *Id.* at 429. Additionally, a course of conduct pursued by a managing conservator that hampers a child's opportunity to favorably associate with the other parent may suffice as grounds for redesignating managing conservators. *In re Marriage of Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ); *Gunther v. Gunther*, 478 S.W.2d 821, 829 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.). A material and substantial change in circumstances may be established by either direct or circumstantial evidence. *In re A.L.E.*, 279 S.W.3d at 429.

## C

At trial, Antonio testified that between the date of the divorce and the trial, he and Sylvia lived in the Houston area where they both had significant family ties. He stated that he and Sylvia routinely cooperated regarding visitation until November 2009 when Sylvia took their child to Mexico.

Antonio denied knowing in advance that Sylvia intended to move their son to Mexico in November 2009. According to Antonio, Sylvia began talking about a future move to Mexico in September or October 2008, but she assured him that she wanted to go there "just for vacation." Sylvia again raised the issue in 2009, but she told him that she would not move without telling him.[1] Antonio acknowledged that he did not believe Sylvia tried to hide the child from him in Mexico, but he also stated that he did not know

[1] Antonio also testified that around the same time Sylvia began talking about moving to Mexico, she began to discuss with him various "conspiracy theories" she believed were going to take place in the United States, including that the United States president was going to declare martial law, take over as dictator, and put people in quarantine. Antonio offered into evidence several emails from Sylvia attaching website pages concerning some of these theories. Sylvia, however, denied that she believed the conspiracy theories and she sent the emails "jokingly about stuff" and she did not believe the American way of life was about to end.

5

what her plans were when she took the child to Mexico.

Antonio testified that he signed paperwork to allow Sylvia to get a passport for their child to go to Mexico on vacation with Sylvia and Miguel. Antonio testified that he wrote on the form "for vacation only" but he did not keep a copy of it. He said that at the time he trusted Sylvia's judgment regarding taking the child to Mexico for vacation, even though he was concerned that Mexico could be dangerous. After Sylvia moved the child to Mexico in November 2009, however, he no longer trusted her judgment. Antonio explained that he believed Sylvia showed poor judgment by taking the child to Mexico without researching in advance whether the area where they were going to settle was dangerous, as well as her decision to take the child to Mexico without having arranged for employment, a home, or a school for the child in advance of the move.

Antonio also testified concerning the events just before Sylvia's move to Mexico. At the time, the child was enrolled in elementary school and had been spending the Halloween weekend with Antonio. Sylvia picked up the child on November 1, a Sunday, and Antonio did not learn they were in Mexico until she contacted him by email two days later. Antonio denied knowing beforehand that Sylvia would be moving their child to Mexico. Also, Antonio stated that the previous Friday, he learned that Sylvia had "disenrolled" the child from his school. When Sylvia came to pick up the child on November 1, he asked her why she had taken the child out of his school, and she replied that she was going to enroll him in a new school near her new residence in Houston. That same day, however, she left for Mexico with the child.

According to Antonio, when Sylvia and Miguel left for Mexico with the child, they had not arranged for jobs, a home, or a school for the child in Mexico. Neither Sylvia nor the child spoke Spanish,[2] and the child had never been to Mexico before. When Antonio received the email after they left, he was "shocked" and drove to Sylvia's house to see if she were still there. Antonio testified that Sylvia's failure to notify him of this change in her residence violated the divorce decree's requirement that each party

---

[2] Antonio testified that he speaks Spanish and has family in Mexico.

notify the other in advance of any intended change of residence.[3] Further, when Sylvia contacted Antonio on November 3, the only address she gave was to a grandmother's house, so he was unable to arrange to send his son a Christmas gift because he did not have their home address. Antonio also stated that Sylvia's cell phone was not working at the time.

After the move, Sylvia refused to allow Antonio to exercise his Christmas visitation rights in violation of the divorce decree. Although they discussed Antonio visiting the child in Mexico, Sylvia did not want the child to travel by plane to Houston because "she didn't trust the airline." Sylvia encouraged Antonio to come to Mexico to see the child, and even bought Antonio a plane ticket, but he was unable to go when the flight was canceled. Sylvia also offered to let Antonio visit at the home she shared with Miguel, but he declined because he thought it would be "awkward." When Antonio suggested he stay in a hotel and visit the child there, Sylvia refused to allow the child to visit his father in a hotel without her supervision. Sylvia did not return to Houston with the child until early January 2010.

Antonio acknowledged that Sylvia was a loving and caring mother and that she and Miguel had done well raising the child, but stated that in the last two years there had been no "co-parenting" and less communication about issues concerning the child. He also did not believe that it was in the child's best interest to live in Mexico. Instead, Antonio claimed that Sylvia and Miguel were putting their own desires before the child's needs. Antonio testified that Miguel worked in various areas throughout the United

---

[3] The divorce decree provides:

Each person who is a party to this order is ordered to notify each other party, the court, and the state case registry of any change in the party's current residence address, mailing address, home telephone number, name of employer, address of employment, driver's license number, and work telephone number. The party is ordered to give notice of an intended change in any of the required information to each other party, the court, and the state case registry on or before the 60th day before the intended change. If the party does not know or could not have known of the change in sufficient time to provide the 60-day notice, the party is ordered to give notice of the change on or before the fifth day after the date that the party knows of the change.

States, and since Sylvia and Miguel returned to Houston, Miguel has worked in Port Arthur, Beaumont, Ohio, and Louisiana. Antonio stated that Sylvia told him she and Miguel wanted to be able to move wherever Miguel was working, but Antonio did not believe it was in the child's best interest to be "bounced around" from place to place. Antonio denied that he had any "issues" about Sylvia remarrying and having another child with Miguel, and he stated that his child was happy to have a baby brother.

Antonio's mother, Imelda, testified that she used to babysit the child for Sylvia on weekdays and, when Antonio was working overseas, she would keep the child during Antonio's periods of possession. After overhearing something the child said, Imelda asked Sylvia whether she was thinking of moving the child to Mexico, and Sylvia replied that she was not. Imelda and Antonio were very surprised when they found out Sylvia had, in fact, moved to Mexico with the child. Imelda acknowledged that, except for the move to Mexico, Sylvia had been a good mother and cooperated with Antonio concerning their child's upbringing. She also acknowledged that she had family in Mexico, but said that the "problems" in Mexico were widespread.

Sylvia testified that Antonio "clearly knew that we were moving." She explained that she left for Mexico no more than three or four hours after she picked up the child at Antonio's residence on November 1, 2009. She admitted, however, that the child did not know he would be going to Mexico. She also admitted that Antonio was unaware that, within hours, she would be leaving for Mexico. Sylvia acknowledged that Antonio first learned that she had moved their child to Mexico when she sent him an email and a text message on November 3, and she admitted she did not give their address in her message. Sylvia explained that when she, Miguel, and her two children arrived in Mexico, they stayed at the home of Miguel's grandmother, and Sylvia did not give Antonio the address of their new residence because they had not yet bought their house.[4] Sylvia also acknowledged that she had no emails or text messages informing Antonio that she had decided to move to Mexico with their child. Further, although Sylvia testified that she

---

[4] Sylvia also testified that Miguel's parents had a home in Mexico that they purchased in 2009 near the time Sylvia and Miguel moved the children there.

completed documentation for her and the child to live in Mexico, she did not provide any of those documents to Antonio.

Sylvia explained that she and Miguel returned to Houston with the children in January 2010 because Miguel had gotten a job in Port Arthur. She admitted that if Miguel had not gotten the job in January, they would not have come back when they did. Before she was served with Antonio's petition to modify the decree, she had planned to return to Mexico with the children so they could start school. She testified that she would have stayed in Mexico with the children while Miguel sought work in the United States, even though she would be alone in a country where neither she nor the child spoke the language. Sylvia admitted that it was not responsible parenting to have moved to another country without having a house or enrolling the child in school.

Sylvia also admitted that the child likes living in Harris County and wants to continue to do so. She agreed that it was in the child's best interest to remain in Harris County, and acknowledged that having the child live close to both parents was important. She also agreed that the child had a close relationship with Antonio and his family. Although Sylvia testified that she did not want the jury to impose a geographical restriction to Harris County, she admitted she stated in her deposition that she did not oppose such a restriction.[5]

Sylvia presented several witnesses in her case-in-chief, including the president of the Parent-Teacher Association of the child's elementary school, Georgette Curran. Curran testified that Sylvia was a very loving and devoted mother who regularly volunteered for the PTA. Curran did not know Antonio and had never seen him at school. A school counselor testified that she knew Sylvia, Antonio, and Miguel, and also confirmed that Sylvia volunteered at the school.

Miguel testified that Antonio knew he and Sylvia were selling their property in Houston and moving to Mexico. According to Miguel, Antonio has never liked him and

---

[5] Sylvia does not challenge the jury's finding that a geographical restriction to Harris County and the contiguous counties should be imposed.

did not like that the child called Miguel "Dad." Miguel testified that when the child was in Mexico, he had daily contact with Miguel's family, including his parents, grandmother, and uncles who lived nearby. Miguel also testified that he and Sylvia had planned to send the child to a private school in Mexico. He admitted, however, that Sylvia made no arrangements for the child's education in Mexico before they moved, and they did not know where the child would go to school before they left Houston. Miguel also admitted that it was in the child's best interest to stay in Harris County and continue to have frequent access to Antonio.

After the case was submitted to the jury, Sylvia moved for a directed verdict, arguing that the evidence was legally insufficient to support a modification of the decree. The trial court denied the motion. Sylvia also argued at the charge conference that no evidence was presented to support the jury questions concerning modification, but the trial court overruled her objections. The jury returned a verdict finding that the divorce decree should be modified to award Antonio the exclusive right to designate the child's residence and that a geographic restriction to Harris County and its contiguous counties should be imposed.

D

Sylvia argues that her move to Mexico with the child was the only basis for Antonio's petition to modify the decree, and this basis is legally insufficient because the decree gave her the exclusive right to designate the child's residence without regard to geographic location and provided specific visitation rights for Antonio if Sylvia moved the child's residence more than 100 miles from Antonio's residence. According to Sylvia, there is no evidence her move was motivated by animus, and she is being punished merely because she exercised the rights granted to her under the decree.

To support her argument, Sylvia points to *Bates v. Tesar*, which she contends includes a discussion of "several out[-]of[-]state cases that are on point" because in those cases the courts held that modification of custody could not be based solely on a relocation of the child's residence. *See* 81 S.W.3d 411, 429 (Tex. App.—El Paso 2002,

10

no pet.) (citations omitted).[6] Although the *Bates* court did survey case law from other jurisdictions relevant to relocation as a basis for modification, the court ultimately concluded that relocation could be sufficient to establish changed circumstances in some situations: "[W]e do not hold that relocation, regardless of distance, will suffice to establish a material and substantial change in circumstances. But if the custodial parent moves a significant distance, a finding of changed circumstances may be appropriate." *Id.* at 430; *see also Jaramillo v. Jaramillo*, 823 P.2d 299, 309 n.9 (N.M. 1991) ("[I]t is difficult to imagine an instance in which a proposed relocation will not render an existing parenting plan or custody-and-visitation arrangement unworkable."). The *Bates* court recognized that a finding of changed circumstances due to relocation "is necessarily fact intensive" and, based on its review of case law, identified the following factors a court should consider:

- the distance involved;
- the quality of the relationship between the non-custodial parent and the child;
- the nature and quantity of the child's contacts with the non-custodial parent, both *de jure* and *de facto*;
- whether the relocation would deprive the non-custodial parent of regular and meaningful access to the children;
- the impact of the move on the quantity and quality of the child's future contact with the non-custodial parent;
- the motive for the move;
- the motive for opposing the move;
- the feasibility of preserving the relationship between the non-custodial parent and the child through suitable visitation arrangements; and
- the proximity, availability, and safety of travel arrangements.

81 S.W.3d at 430. Other courts, including this court, have followed the *Bates* court's reasoning and considered the listed factors when determining whether relocation could support a finding of material and substantial change in circumstances. *See, e.g.*, *In re*

---

[6] Beyond referring to the out-of-state cases she contends are on point, Sylvia does not discuss them.

11

*A.C.S.*, 157 S.W.3d 9, 22–24 (Tex. App.—Waco 2004, no pet.); *Knopp v. Knopp*, No. 14-02-00285-CV, 2003 WL 21025527, at *3–5 (Tex. App.—Houston [14th Dist.] May 8, 2003, no pet.) (mem. op.); *In re W.C.B.*, 337 S.W.3d 510, 514 (Tex. App.—Dallas 2011, no pet.); *In re M.S.R.*, No. 13-05-493-CV, 2007 WL 3228072, at *3 (Tex. App.—Corpus Christi Nov. 1, 2007, pet. denied) (mem. op.); *In re C.R.O.*, 96 S.W.3d 442, 449 (Tex. App.—Amarillo 2002, pet. denied).

Applying the *Bates* court's factors to the evidence in this case, more than a scintilla of evidence supporting modification was presented for the jury's consideration. The jury heard evidence that Sylvia took the child to another country without telling Antonio beforehand; the child was abruptly removed from school in the middle of the term; Sylvia and Miguel had not secured jobs or a home in Mexico at the time they left with the child; and Sylvia failed to return the child to Antonio for his possession periods and Christmas visitation as provided in the decree. The jury also heard evidence that Antonio's ability to exercise visitation with the child would be significantly impaired if Sylvia were allowed to move him to Mexico or other parts of the United States to accommodate Miguel's employment. Although Sylvia maintains that we must consider "the move to Mexico" in isolation, the record clearly demonstrates that the facts and circumstances surrounding the move informed Antonio's decision to seek the modification and support the jury's finding.

Sylvia argues, however, that Antonio's testimony is no more than "opinions" unsupported by the evidence, and that any "negative inferences" against Sylvia based on the move to Mexico would be "unreasonable, not based on direct evidence, and contrary to the equally positive inferences in favor of Sylvia that can be drawn from this fact." We disagree with Sylvia's characterization of the evidence. As Sylvia notes in her brief, "[t]he primary dispute centered on when [Antonio] learned that Sylvia intended to move to Mexico with the child." Such a dispute involves a credibility determination that the jury was entitled to resolve, and it apparently resolved it in Antonio's favor. Concerning the jury's resolution of underlying facts and credibility determinations, we do not

12

substitute our judgment for the fact finder's. *In re A.L.E.*, 279 S.W.3d at 427; *see Bates*, 81 S.W.3d at 432.

We conclude that on this record the evidence is legally sufficient to support the jury's finding that the parties' divorce decree should be modified to designate Antonio the conservator with the exclusive right to designate the child's primary residence. We overrule Sylvia's first and second issues.

### III

In her third issue, Sylvia contends the trial court abused its discretion by including in the modification order the following injunctive relief:

> The Court finds that, based on the public policy considerations stated in section 153.001 of the Texas Family Code, it is in the best interests of the child that the following injunction be issued and related orders be entered.

> IT IS ORDERED that [Sylvia] is permanently enjoined from traveling outside the continental United States without the prior, written consent of [Antonio].

Neither the record nor the order includes any written findings of fact supporting the injunction. Sylvia notes that, in connection with the trial court's injunction, the court denied her post-trial request that her passport be returned.[7]

According to Sylvia, the injunction violates her "fundamental right to travel," which is protected by the due-process and equal-protection clauses of the United States Constitution. *See* U.S. Const. amends. V & XIV; *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 901–02 (1986); *Kent v. Dulles*, 357 U.S. 116, 126 (1958); *cf. Califano v. Aznavorian*, 439 U.S. 170, 176–77 (1978) (stating that although the constitutional right of interstate travel is "virtually unqualified," the right to international travel "has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment" and so "is not to be judged by the same

---

[7] On appeal, Sylvia does not separately address the trial court's denial of her motion to return her passport or request that we order the passport returned to her.

13

standard as restrictions on the right to interstate travel"). Sylvia also argues that a governmental purpose to control or prevent activities constitutionally subject to state regulations "may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *See Aptheker v. Sec'y of State*, 378 U.S. 500, 508 (1964); *see also Zemel v. Rusk*, 381 U.S. 1, 14 (1965) ("The requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction.").

We review the trial court's grant of a permanent injunction for an abuse of discretion. *Jim Rutherford Invs.*, *Inc. v. Terramar Beach Cmty. Ass'n,* 25 S.W.3d 845, 848 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to guiding rules or principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). A trial court also abuses its discretion by failing to analyze or apply the law correctly. *Id.* An abuse of discretion does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *In re A.L.E.*, 279 S.W.3d at 428. We consider only the evidence most favorable to the trial court's ruling, and will uphold its judgment on any legal theory supported by the evidence. *Id.*

In response, Antonio does not address Sylvia's constitutional argument against the injunction; instead, he argues that two provisions of the Family Code authorize the trial court's injunction: (1) the public-policy concerns of section 153.001 (the trial court's stated basis), and (2) the measures a court may order to protect a child from international abduction by a parent contained in section 153.503, which authorizes the trial court to order certain "passport and travel controls" if the court determines such measures are necessary to protect the child from the risk of abduction by the parent (a basis not identified by the trial court). Statutory construction is a legal question we review de novo. *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 500 (Tex. 2010). When construing statutes, we ascertain the legislature's intent from the plain meaning of the actual language used. *Lenz*, 79 S.W.3d at 19.

Family Code section 153.001 provides that the public policy of Texas is to:

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;

(2) provide a safe, stable, and nonviolent environment for the child; and

(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

Tex. Fam. Code § 153.001(a); *see also* Tex. Fam. Code § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

Antonio suggests the injunction promotes the public-policy considerations of section 153.001 because it "encourages [Sylvia] to prioritize the best interest of the child above her own interest and that of her husband's" and requires Sylvia and Antonio "to communicate with each other should [Sylvia] desire to leave the continental United States." According to Antonio, the trial court could have considered his testimony regarding his efforts to share child-rearing duties with Sylvia and to provide the child with frequent and continuing contact with her, even as Sylvia became less cooperative. Antonio also argues that the injunction provides "protection" for him and the child and allows him to agree to give Sylvia unsupervised access to the child.

Construing this evidence in the light most favorable to the trial court's ruling, we nevertheless conclude that the public-policy imperatives of section 153.001 are not necessarily advanced by the injunction imposed. As written, the trial court's injunction permanently restricts Sylvia's ability to travel outside "the continental United States,"[8] meaning she may not travel internationally—or even to Hawaii—at any time and for any

---

[8] For purposes of federal employee pay and allowances, the "continental United States" means "the several States and the District of Columbia, but does not include Alaska or Hawaii." 5 U.S.C. § 5701. According to Bryan Garner, however, the phrase is commonly misunderstood to exclude Alaska, which he notes is "a sizable state on the northwest corner of the North American continent." *See* Bryan A. Garner, GARNER'S MODERN AMERICAN USAGE 196–97 (3d ed. 2009) (discussing definition of "contiguous"). Significantly, the trial court's use of the phrase here means that the injunction prohibits travel to at least one U.S. state.

15

reason without first obtaining her ex-husband's consent, whether or not she intends to have the child travel with her. Indeed, the child is not mentioned at all. Consequently, the injunction goes far beyond merely "promoting communication" between the parents while doing nothing to encourage Sylvia to "prioritize" the child's best interests. Moreover, concerning Antonio's claim that the injunction facilitates Sylvia's unsupervised access to the child, we note the trial court awarded to Antonio the right to hold the child's passport, giving Antonio significant control over any international travel with the child and limiting Sylvia's ability to take the child to another country. We conclude the trial court's reference to the public-policy considerations of section 153.001 do not support this injunction.

Antonio also relies on Family Code section 153.503, which specifically addresses the types of measures the trial court may take when presented with credible evidence of a potential risk of international abduction of a child by a parent. *See* Tex. Fam. Code § 153.503 (listing abduction-prevention measures the trial court may take based upon certain findings); *see also* Tex. Fam. Code § 153.501 (providing that the court shall determine whether abduction-prevention measures are required); § 153.502 (listing risk factors the trial court shall and may consider). Relevant here, one of the authorized actions the trial court may take is to order certain "passport and travel controls." *Id.* § 153.503(4).

The trial court is authorized to consider such measures by Family Code section 153.501. This section, titled "Necessity of Measures to Prevent International Parental Child Abduction," provides:

> In a suit, if credible evidence is presented to the court indicating a potential risk of the international abduction of a child by a parent of the child, the court, on its own motion or at the request of a party to the suit, shall determine under this section whether it is necessary for the court to take one or more of the measures described by Section 153.503 to protect the child from the risk of abduction by the parent.

Tex. Fam. Code § 153.501(a). When determining whether international child-abduction

measures are necessary, the trial court shall consider:

> (1) the public policies of this state described by Section 153.001(a) and the consideration of the best interest of the child under Section 153.002;
>
> (2) the risk of international abduction of the child by a parent of the child based on the court's evaluation of the risk factors described by Section 153.502;
>
> (3) any obstacles to locating, recovering, and returning the child if the child is abducted to a foreign country; and
>
> (4) the potential physical or psychological harm to the child if the child is abducted to a foreign country.

*Id.* § 153.501(b).

Section 153.502 directs the trial court to consider specific evidence concerning a parent when evaluating the risk of international abduction of the child. *See* Tex. Fam. Code § 153.502(a). If the trial court finds credible evidence of a risk of international abduction based on these considerations, the court shall also consider additional enumerated factors. *Id.* § 153.502(b). The statute also lists factors the trial court may consider in determining the risk of international abduction. *Id.* § 153.502(c). Courts have held that a court need make an affirmative finding on only one of the factors under section 153.502(a) to proceed to consider the additional factors under subsections (b) and (c). *Elshafie v. Elshafie*, No. 13-10-00393-CV, 2011 WL 5843674, at *5 (Tex. App.— Corpus Christi Nov. 22, 2011, no pet.); *In re Sigmar*, 270 S.W.3d 289, 299 (Tex. App.— Waco 2008, orig. proceeding).

Antonio contends credible evidence was presented to support the necessity for abduction-prevention measures under section 153.501, including the risk factors identified in subsections 153.502(a)(1), (a)(3), (b)(2), and (c)(4)(A)–(C), (E), (J). *See* Tex. Fam. Code §§ 153.502(a)(1) (evidence that a parent "has taken, enticed away, kept, withheld, or concealed a child in violation of another person's right of possession of or access to the child, unless the parent presents evidence that the parent believed in good faith that the parent's conduct was necessary to avoid imminent harm to the child or the parent"); 153.502(a)(3) (evidence that the parent "lacks financial reason to stay in the

17

United States, including evidence that the parent is financially independent, is able to work outside of the United States, or is unemployed"); 153.502(b)(2) (evidence that a parent "lacks strong ties to the United States, regardless of whether the parent is a citizen or permanent resident of the United States"); 153.502(c)(4) (evidence concerning the foreign country to which the parent has ties).[9]

Specifically, Antonio points to the following facts: (1) Sylvia took the child to Mexico without notice to Antonio, failed to enroll the child in school, and denied Antonio contact with and access to the child in violation of the divorce decree; (2) Sylvia offered no evidence that her actions were necessary to avoid imminent harm to herself or the child; and (3) Miguel was between jobs and had chosen to decline work and drawn unemployment benefits while he and Sylvia were in Mexico. Antonio also cites *In re Sigmar*, in which the trial court made findings that Mexico "is a country for which the State Department has issued a travel warning to U.S. citizens" and "poses a risk to [the child's] physical health and safety because of her specific circumstances and because of

---

[9] Relevant here, Antonio points to the following subsections of section 153.502(c)(4), which concern whether the foreign country to which the parent has ties:

(A) presents obstacles to the recovery and return of a child who is abducted to the country from the United States;
(B) has any legal mechanisms for immediately and effectively enforcing an order regarding the possession of or access to the child issued by this state;
(C) has local laws or practices that would:
    (i) enable the parent to prevent the child's other parent from contacting the child without due cause;
    (ii) restrict the child's other parent from freely traveling to or exiting from the country because of that parent's gender, nationality, or religion; or
    (iii) restrict the child's ability to legally leave the country after the child reaches the age of majority because of the child's gender, nationality, or religion;
. . .
(E) is a country for which the United States Department of State has issued a travel warning to United States citizens regarding travel to the country;
. . .
(J) poses a risk that the child's physical health or safety would be endangered in the country because of specific circumstances relating to the child or because of human rights violations committed against children, including arranged marriages, lack of freedom of religion, child labor, lack of child abuse laws, female genital mutilation, and any form of slavery.

*Id.* § 153.502(c)(A)–(C), (E), (J).

18

'human rights violations committed against children, including child labor and lack of child abuse laws.'" 270 S.W.3d at 303–04.

Assuming the trial court made one or more implied findings based on the evidence Antonio recites to support the imposition of abduction-prevention measures under section 153.503(4), we must decide whether this section authorizes the injunctive relief the trial court imposed. Section 153.503(4) provides that a trial court may "order passport and travel controls," including controls that:

> (A) prohibit the parent and any person acting on the parent's behalf from removing the child from this state or the United States;
>
> (B) require the parent to surrender any passport issued in the child's name, including any passport issued in the name of both the parent and the child; and
>
> (C) prohibit the parent from applying on behalf of the child for a new or replacement passport or international travel visa.

*Id.* § 153.003(4). Notably, each of the possible passport and travel controls listed are directed to controlling the *child's* whereabouts or the *child's* documents, reflecting the legislature's intent to prevent the international abduction of children by their parents. This statutory language is consistent with the legislature's primary emphasis on the best interest of the child. *See Lenz*, 79 S.W.3d at 14 ("The Legislature has made clear that '[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.'") (citing Tex. Fam. Code § 153.002); Tex. Fam. Code § 153.501(b) (directing the court to consider, among other things, the public policies of this state and the consideration of the best interest of the child when determining whether to take any of the abduction-prevention measures described by section 153.503).

The injunction imposed in this case, however, permanently enjoins Sylvia from traveling outside the continental United States without Antonio's prior, written consent; it is not directed to travel with the child, surrender of the child's passport, or restrictions on obtaining travel-related documents for the child. Instead, Sylvia is prohibited from

traveling "outside the continental United States" at any time, and for any reason—with or without the child—unless she first obtains her ex-husband's consent. The trial court certainly has broad discretion to impose abduction-prevention measures and may order "passport and travel controls" not limited to those specifically listed in section 153.503(4). But, a review of this subsection, as well as the statutory scheme as a whole, does not support the trial court's injunction because the travel restrictions imposed are not directed to international child-abduction prevention. Instead, the trial court has enjoined Sylvia's ability to travel generally, even without the child. Therefore, we conclude that the trial court abused its discretion by ordering the injunction. *Cf. Sigmar*, 270 S.W.3d at 307 (holding trial court did not abuse its discretion in ordering supervised visitation as an abduction-prevention measure); *In re C.R.O.*, 96 S.W.3d at 452 (holding trial court's imposition of domicile restriction did not infringe on appellant's constitutional right to travel because the restriction "applied only to the children" and so did not affect appellant's ability to exercise her rights).

Moreover, because the injunction is overly broad, unreasonably restrictive, and unrelated to either the child's best interest or the prevention of international child-abduction prevention, we agree with Sylvia that it violates her constitutional right to travel. *See Califano*, 439 U.S. at 176–78; *Zemel*, 381 U.S. at 14; *Aptheker*, 378 U.S. at 508.

We therefore sustain Sylvia's third issue and modify the trial court's order to dissolve the injunction against Sylvia.

IV

In her fourth and fifth issues, Sylvia contends the award of attorney's fees to Antonio's counsel should be set aside because the attorney failed to obtain a jury finding supporting the award and there is no evidence to support the award. Sylvia contends she preserved the attorney's-fees issues in her post-trial motion, which was overruled by operation of law.

Sylvia acknowledges that Antonio was awarded attorney's fees under Family Code section 106.002, which provides that in a suit affecting the parent-child relationship, "the court may render judgment for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney." Tex. Fam. Code § 106.002(a). Sylvia maintains that she requested a jury trial and therefore she was entitled to have the jury determine the amount of reasonable attorney's fees to be awarded. According to Sylvia, because Antonio failed to obtain a jury finding on his attorney's fees, he has waived that relief. Antonio responds that Sylvia waived her complaints by failing to timely object to the trial court's decision to hear the attorney's fees issue rather than the jury.

The record shows that Antonio filed proposed jury questions, which included a question on attorney's fees. During the second day of trial, however, the trial court announced that it, rather than the jury, would rule on the issue of attorney's fees:

> There's been a short discussion off the record regarding attorney's fees and the Court has determined that attorney's fees will be heard by the Court only; and therefore, will not be an issue, nor will there be any testimony regarding attorney's fees from this point forward in front of the jury, nor will there be an issue presented to the jury regarding.

The record does not show that any party objected to this announcement by the trial court. Later that afternoon, Antonio rested his case without offering evidence on attorney's fees. On the third day of trial, Sylvia began her case-in-chief, and she testified before the jury that she paid her counsel a "flat fee" of $6,000. Sylvia's counsel offered no other evidence of her attorney's fees.

At the jury charge conference, Antonio withdrew his attorney's-fee question when the trial court raised the issue:

> The Court: Now, 6 is going to be eliminated by agreement, correct? That's the attorney's fees?
>
> [Antonio's counsel]: Yes.
>
> [Sylvia's counsel]: Well, not by agreement. He's just withdrawing it.

21

The Court: Well, you have not put any attorney's fees on, correct?

[Sylvia's counsel]: No, I have not.

. . .

[Antonio's counsel]: 6 is being withdrawn?

The Court: I understand. I understand. I think we discussed that on the record earlier. I'm well aware.

After the jury was released, the trial court announced that the parties could testify regarding their attorney's fees or submit their evidence by affidavit:

> The Court: I'm going to tell you a couple of things before I have you — y'all can take a seat. As far as the other decisions that will be made by this Court, I believe that I have enough information to do that without further testimony, but I'm open for suggestion on that. As far as — and let me just tell you what I'm talking about. We have — I know that I have not been given attorney's fees. If you-all wish to testify as to that today, you may do that.
>
> If you do not wish to do so, then we can certainly do that by affidavit, unless somebody's going to be objectionable to doing that as far as attorney's fees are concerned, and I will consider those.

After addressing some other matters, the amicus attorney for the child requested that she be awarded her attorney's fees, and the trial court suggested she submit an affidavit supporting her request:

> The Court: What I would encourage you to do is do it by attorney's affidavit regarding your attorney's fees.
>
> Make sure that they've been sent to both counsel, obviously. And if there's any dispute, you-all need to file a motion for me to hear on the date of the entry. Otherwise, I'll make my ruling and you may as far as that issue is concerned take that up at the entry unless you-all are going to agree and sign off on it, the order.
>
> So, any way, I'm going to have her do it by affidavit. If you-all want to have an oral hearing on it, you need to ask for it is what I'm saying.
>
> . . .
>
> [Sylvia's counsel]: The timeframe for the next process of what we should be submitting to the Court on any issues? You said an affidavit or —

22

The Court: No. Just for her, for her affidavit. . . .

The amicus attorney agreed to submit her attorney's-fees affidavit the following week. Sylvia does not appeal the attorney's fees awarded to the amicus attorney.

Shortly after trial, Antonio's counsel submitted an affidavit in support of his attorney's fees. Antonio's counsel averred that he was an attorney licensed to practice law in Texas since 1979, he was familiar with the typical and usual costs of attorney's fees for causes of this nature, and the charges specified were reasonable and necessary. Antonio's counsel described the number of hours billed and his hourly rate, and requested attorney's fees of $34,000 and expenses of $1,588.66, totaling $35,588.66. Attached to the affidavit were supporting invoices. Sylvia presented no controverting evidence. On May 31, 2011, the trial court signed the modification order awarding Antonio's counsel's attorney's fees of $34,000. Sylvia filed a post-judgment motion to reform or modify the final order in which she raised various complaints about the trial court's award of attorney's fees to Antonio.

We do not reach the merits of Sylvia's claim that she was entitled to a jury trial on attorney's fees because we agree with Antonio that Sylvia failed to preserve the issue. When a party has perfected its right to a jury trial but the trial court instead proceeds to trial without a jury, the party must either object on the record to the trial court's action or indicate affirmatively in the record it intends to stand on its perfected right to a jury trial. *See In re K.M.H.*, 181 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *In re A.M.*, 936 S.W.2d 59, 61 (Tex. App.—San Antonio 1996, no writ); *Sunwest Reliance Acquisitions Grp., Inc. v. Provident Nat'l Assurance Co.*, 875 S.W.2d 385, 387 (Tex. App.—Dallas 1993, no writ). The record here does not reflect that Sylvia either affirmatively objected to the trial court's decision to remove the attorney's-fees issue from the jury's consideration or indicated that she intended to stand on her right to a jury trial.

Sylvia contends it would have been illogical for her to object during Antonio's case-in-chief because the onus was on Antonio to object or make an offer of proof. Sylvia

23

also notes that Antonio did not object when she asked a leading question about her attorney's fees during the presentation of her case. According to Sylvia, she did not have an obligation to request a jury question on a point on which Antonio sought relief, and therefore she "needed do no more that [sic] make it clear that she was not agreeing with [Antonio's] decision to not submit the jury question." However, the trial court's initial announcement clearly indicates the decision applied to both parties, not just Antonio. Therefore, Sylvia was required to object or risk waiving her right to a jury trial on attorney's fees. *See In re K.M.H.*, 181 S.W.3d at 8; *In re A.M.*, 936 S.W.2d at 61; *Sunwest Reliance Acquisitions Grp.*, 875 S.W.2d at 387.

Sylvia also argues that she specifically stated on the record during the charge conference that she was not agreeing to Antonio's withdrawal of his attorney's-fees question. But Sylvia's assertion during the charge conference that Antonio's decision to remove its attorney's-fee question was "not by agreement" is insufficient to preserve the complaint that she was entitled to a jury trial on attorney's fees for appeal. Even if the comment was sufficient to alert the trial court to her complaint, Sylvia has waived the issue because raising it for the first time during the charge conference is too late. *See In re D.R.*, 177 S.W.3d 574, 580 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (appellants who did not object to bench trial until charge conference waived complaint that case was not submitted to a jury). For the same reason, raising the issue in her post-judgment motion was also untimely. *See Sunwest Reliance Acquisitions Grp.*, 875 S.W.2d at 386–87.

Turning to Sylvia's complaint that the evidence is legally insufficient to support the attorney's-fee award, her sole argument under this issue is that Antonio had the burden to offer evidence of reasonable attorney's fees, but he offered no attorney's-fees evidence during the jury trial, and even if he had offered the attorney's-fees affidavit at trial, it would be inadmissible hearsay. Because we have held that Sylvia failed to preserve her complaint that she was entitled to a jury trial on attorney's fees, we conclude she has waived this issue as well. *See Spencer v. Vaughn*, No. 03-05-00077-CV, 2008

24

WL 615443, at *13–14 (Tex. App.—Austin March 6, 2008, pet. denied) (mem. op.). Even if we reached the issue, however, we would hold that the trial court did not abuse its discretion in awarding attorney's fees in this case. *See id.* at 14.

We therefore overrule Sylvia's fourth and fifth issues.

* * *

We sustain Sylvia's third issue concerning the trial court's injunction permanently enjoining Sylvia from traveling outside the continental United States without the prior, written consent of Antonio and order that portion of the trial court's modification order dissolved. We overrule Sylvia's other issues and affirm the remainder of the modification order.


/s/     Jeffrey V. Brown
Justice


Panel consists of Chief Justice Hedges and Justices Brown and Busby.