**Affirmed and Memorandum Opinion filed April 18, 2013.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-11-01092-CV

_____

**MARK THORNTON AND DEBRA DEMPSEY THORNTON, Appellants**

**V.**

**AMANDA CASH AND DANA VARNEY, Appellees**

**On Appeal from the 308th District Court
Harris County, Texas
Trial Court Cause No. 2010-19565**

## M E M O R A N D U M   O P I N I O N

Appellants, Mark and Debra Dempsey Thornton, appeal from the trial court's modification of a conservatorship and possession order as part of the final decree of divorce ending Amanda Cash and Dana Varney's marriage. The order changed the Thorntons' status from joint managing conservators to possessory conservators of Cash and Varney's daughter, M.V. The trial court also ordered the Thorntons to pay the amicus attorney's fees as well as a portion of Cash's

attorney's fees. In three issues on appeal, the Thorntons contend that the trial court: (1) improperly applied a parental presumption; (2) erred in failing to consider the child's objectives and preventing the amicus attorney from fully participating in the trial; and (3) erred in assessing the amicus attorney's fees and a portion of Cash's attorney's fees against them. Finding no error, we affirm.

## BACKGROUND

### A. Procedural background

Cash and Varney were married in 1996. They eventually had two children, a boy, M.H.V., and a girl, M.V. M.V., the child at issue in this appeal, was born in 2000. In 2004, the Thorntons filed an original suit seeking custody of M.V. (the "2004 Case").[1] On January 15, 2010, pursuant to an agreed order, Cash and Varney on the one hand, and the Thorntons on the other, were appointed joint managing conservators of M.V. The January 2010 order awarded the Thorntons specified periods of possession of M.V. and awarded Cash and Varney the exclusive right to designate M.V.'s primary residence.

On March 26, 2010, Cash filed a petition for divorce from Varney (the "Divorce Action"). In her petition, Cash asked the court, with respect to M.V., to incorporate the January 2010 agreed order "into any Final Decree of Divorce in this matter as if quoted verbatim." Varney filed an answer and counter-petition for divorce.

The Thorntons filed an answer in the Divorce Action, and then filed a petition in intervention for conservatorship. In their petition in intervention the

---

[1] Because the 2004 Case is not before us, the record on appeal does not reveal how the Thorntons—who are not biologically related to M.V.—gained standing to seek custody of M.V. In this case, the trial court removed the Thorntons as joint managing conservators, and we affirm that decision as explained below. Cash and Varney have not appealed the trial court's decision to allow the Thorntons to continue as possessory conservators.

2

Thorntons alleged "there has been a material and substantial change of circumstances since the rendition of the last order and modification of the terms and conditions of access and periods of possession of [M.V.] on both a temporary and final basis is necessary and in the best interest of the child." In their intervention petition, the Thorntons asked the trial court to award them additional periods of possession of M.V. such that they would "have possession of [M.V.] at all times not allocated to the parents." The trial court appointed an amicus attorney to represent the interests of the two children.

In November 2010, Cash and Varney filed a "Joint Motion to Modify Parent-Child Relationship" in the 2004 Case. In their Joint Motion, Cash and Varney alleged that "the circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified." In their joint motion, Cash and Varney asked the trial court to remove the Thorntons as managing conservators and to deny them any conservatorship over M.V.

The Thorntons then filed a "Counterpetition to Modify the Parent-Child Relationship" in the 2004 Case. Once again, the Thorntons alleged that "the circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified." In their Counterpetition, in addition to asking for other relief, the Thorntons asked the trial court to grant them "the right to designate the primary residence of the child."

**B.      The bench trial regarding custody of M.V.**

Eventually, the 2004 Case was consolidated into the Divorce Action. Cash and Varney reached a mediated settlement agreement regarding their son and the division of their property. All issues relating to M.V. were addressed in a bench

trial, which occurred on August 30 and 31, 2011. Four witnesses testified during the bench trial. Because this appeal includes a challenge to the sufficiency of the evidence supporting the trial court's custody ruling, we discuss the evidence in some detail.

### 1.    Mother's testimony

Cash, M.V.'s mother, testified first. Cash began by discussing the impact the Thorntons' alleged lack of cooperation was having on M.V. According to Cash, the Thorntons made it impossible for Cash to enroll M.V. in school activities and dance classes because they believed it would interfere with their Thursday visitation. In addition, Cash testified that M.V. was unable to attend various weekend activities, such as birthday and Halloween parties, that occurred on the Thorntons' weekends.

Cash's testimony touched on M.V.'s education. Cash testified that M.V. does well in school and that she regularly assists M.V. with her homework and studying. Cash also testified that she regularly visits M.V.'s school and meets with her teachers and counselors. Cash admitted that M.V. has had some disciplinary problems at school and is frequently late to school when she is in the custody of the Thorntons. Cash also testified that M.V. had received a Saturday detention and it fell on a weekend when she was with the Thorntons. According to Cash, the Thorntons failed to take M.V. to the detention and she faced possible suspension from school as a result.

Cash also testified regarding her son, M.H.V., and his relationship with M.V., his younger sister. According to Cash, the two siblings are close and M.V. loves her brother. Cash testified that she was aware the Thorntons were not interested in her son, and that she did not believe the siblings should be separated. Cash also testified that her son does well in school, participates in the school

4

orchestra, and plays football. She explained that her son is able to participate in more activities than M.V. Cash's testimony also addressed inappropriate internet activities by M.H.V. and her efforts to monitor those activities and discipline M.H.V.

Cash admitted she was unemployed at the time of the bench trial but she asserted that she has the ability to return to work as a licensed vocational nurse. Cash also testified that she receives $406.00 each week in unemployment benefits as well as Medicaid and food stamps.

Cash also testified regarding her voluntary surrender of her nursing license in 2007. Cash explained that the Texas Board of Nursing has given her the opportunity to get her license reinstated. Cash testified that, to regain her license, she must successfully complete (1) a refresher course that costs $1,500.00; (2) six months of supervised employment; and (3) three years of discretionary monitoring by the board to ensure she is capable of working safely and ethically as a nurse. Cash testified that she was in the process of meeting those conditions, but in the meantime, she was enjoying the time she has with her children.

Cash's testimony also covered her prior drug issues and she testified that drugs were no longer a problem for her. Cash admitted that she has been required to take or has voluntarily taken random drug tests since January 2010, and the results of those tests have been negative. Cash also testified that she still attends "NA" and "AA" twelve-step meetings, usually four or five times a week.[2] Cash admitted that she takes several prescription medications, including Meloxicam,

---

[2] Cash did not testify to the full names of these two organizations. Later testimony during the bench trial explained that "NA" stands for Narcotics Anonymous.

Suboxone, and Soma.[3] Cash also admitted that she smokes in her apartment, including when M.V. is present.

Cash admitted during her testimony that she had started a relationship with Bruce Roberts. Cash also admitted that Roberts spends the night at her home on a regular basis, but she did not believe this was disruptive for M.V. or set a bad example. Cash's testimony also addressed Roberts's fifteen year old son, J.R., and his online activities. According to Cash, these activities did not occur while J.R. was in her home, but she had discussed them with him and he was punished for those activities.

Cash also addressed M.V.'s attitude toward the Thorntons. Cash testified that M.V. is not biologically related to the Thorntons. When asked if there have been things that Cash had not been able to get or had refused to get M.V. that M.V. wanted, Cash answered that there had been, but the Thorntons would often buy her those things. Cash testified that the Thorntons had bought M.V. a cell phone and laptop computer, items Cash had refused to purchase M.V. because she believed M.V. was not old enough to have them. Cash testified that M.V. receives Christmas gifts from the Thorntons and those gifts remain at the Thornton residence. Cash also admitted M.V. likes to visit the Thorntons because, according to Cash, M.V. "gets all kind of stuff," including laptops, guinea pigs, and trips. Cash testified that M.V. does not have permission to use the computer in her home, but Mr. Thornton had created a Facebook page for her.

Cash testified that M.V. calls her "mom" or "mommy" and Varney "daddy." She also testified without objection that she is concerned that the Thorntons are "not [M.V.'s] mom and dad, . . . and she needs as normal of an opportunity to be

---

[3] Cash was not asked why she takes these prescription drugs. In addition, there is no other evidence in the appellate record explaining the purpose of these three prescription drugs.

6

able to grow up in a family unit as possible." Cash then testified that under the January 2010 agreed order, the Thorntons have possession of M.V. 47% of the time while she and Varney have M.V. the remaining 53%. Once they divorced, Cash testified that unless the court changed the possession order, she and Varney would have to divide their possession in half while the Thorntons would still have possession of M.V. for 47% of the time. Cash testified, again without objection, that she believed this was backwards and would not be fair to Varney, M.V.'s father.

Cash also testified, during cross-examination by the Thorntons' attorney, that she had concerns about the care the Thorntons provide M.V. According to Cash, she believes it is disruptive for M.V. to be "split three ways." Cash also testified that she believes it is disruptive for M.V. "to call non-related people Mommy and Daddy." Despite that, Cash admitted that M.V. is an important part of the Thorntons' lives and that M.V. has a relationship with them.

### 2. Father's testimony

Varney was the next witness to testify. Varney testified that he had been married to Cash for approximately fourteen years and it was the stress arising out of M.V.'s continuing custody case that caused Cash and Varney to file for divorce. Varney then testified about their efforts to cooperate in the raising of their children despite the divorce. Varney testified they attend activities together, cooperate with one another to make sure the two children get to school on time, and both help with the homework.

Varney also testified that M.H.V. is a good student, athlete, and successful student musician. Varney admitted that he had caught M.H.V. making inappropriate postings on the internet. Varney explained that he has made efforts to address that issue directly with M.H.V., by talking to M.H.V.'s school

7

counselors, and by placing parental controls on the computer. Varney denied M.H.V. uses drugs and testified that M.H.V. has not caused any trouble at school or otherwise.

Varney then turned to the topic of the impact of his separation from Cash on his ability to interact with his children. Varney testified that he now sees both of his children less than he has ever seen them before. Varney testified this was the result of not only his efforts to work more to cover the expenses associated with the divorce, child support, and the children's ongoing activities, but also the amount of time M.V. spends with the Thorntons.[4] Varney testified that he did not believe he would be able to have a full relationship with M.V. if the Thorntons' possession periods remained unchanged.

According to Varney, under the present possession order, M.V. would miss all of M.H.V.'s approaching football games because they occur on Thursday evenings, which she spends with the Thorntons. Varney testified that the separation of M.V. and M.H.V. was negatively impacting their relationship. In addition, when she is unable to attend M.H.V.'s football games, M.V. would miss the opportunity to interact with her friends who also attend the games. Varney testified that M.V. has friends in Baytown, where both he and Cash live. Varney testified that M.V. is able to visit with her Baytown friends when she stays at either her mother's or father's residences, but is not able to do so when she stays with the Thorntons, who live in Pasadena.

Varney was also questioned about Cash's relationship with Roberts. Varney admitted he has only met Roberts a few times and he does not know what kind of man Roberts is and, as a result, he has concerns. (3RR64) Varney testified that he

---

[4] Varney, who has a total of five children, admitted he had missed child support payments for his children other than M.H.V. and M.V. in the past, and was now making those payments.

believed Cash met Roberts at an "NA" meeting.[5]   Varney testified that he is concerned that Cash and Roberts are having a sexual relationship when M.V. is staying at Cash's apartment.   Varney testified he is concerned that, because Roberts lives in Texarkana, Cash might move there with the children.

Varney testified that he has had to accept the fact that the Thorntons are part of M.V.'s life, their home is a comfortable environment for M.V., and it would not be beneficial to completely remove them from her life, but he admitted it has still been difficult to accept that they spend more time with his daughter than he does. When asked what he would like the possession order for M.V. to include, Varney testified he would prefer that she be with him, but failing that, that she be with her mother.  Varney also expressed a strong desire that the children remain in the same area so he could "see them constantly."  Varney also testified that he believed M.V. and M.H.V. should be together.

### 3.    Mr. Thornton's testimony

Mark Thornton was the third witness to testify during the bench trial. Thornton began by stating that he and his wife were asking the court to award them primary custody of M.V., including the right to designate her primary residence. Thornton also testified that if the trial court decided to leave the possession periods the same, he believed that requiring Cash and Varney to split their formerly shared possession time in half was fair.  Thornton admitted he refused Cash's request that M.V. be allowed to participate in dance classes on Thursday evenings.  Thornton believed this decision was in M.V.'s best interest because she would have missed her therapist appointments as a result.  According to Thornton, M.V.'s therapist is

---

[5] Varney admitted during his testimony that he has regularly attended "NA" meetings for eight years.

only available on Thursdays. Thornton admitted he did not work with Cash and Varney in an effort to get M.V. into another therapy group when this conflict arose.

Thornton admitted that M.V. started visiting the Thorntons at their home before they were married. When asked why, in his view, it was acceptable for M.V. to visit the Thorntons' home before they married, but it was not acceptable for M.V. to be in Cash's residence at the same time that Roberts was visiting, Thornton answered: "I guess I see our situations as different."

When asked if he takes any credit for M.H.V.'s various accomplishments, Thornton answered: "[A]bsolutely not. I don't claim credit for anything [M.H.V.] does." When asked about M.V.'s grades, Thornton agreed they were good. Thornton then claimed credit for M.V.'s success. Thornton was then asked why, if Cash and Varney "were capable of raising [M.H.V.] and turning him into a good student and a football player and a statewide trombone player that they wouldn't be capable of doing the same thing for their daughter [M.V.]?" Thornton answered: "From what I've seen, no." Thornton also testified that he did not believe Cash and Varney were good parents. Thornton admitted, however, that he believed Varney is very good to his daughter.

Thornton was then asked a variety of questions by Cash's attorney. During that questioning, Thornton admitted he did not think it was healthy for a child to have a "back door" she could use any time the child was not happy with her parents by saying "I'm going to go live with someone else." Thornton also admitted he did not think it was healthy for a child to be torn between her biological parents and third parties. Thornton admitted that he and his wife have not bought M.V. any school clothes or supplies that they allow her to take home to Cash's residence. Thornton went on to admit they keep all of the things they buy M.V. at their home. Thornton also admitted that when M.V. was staying with

them for the month of July, he refused to allow her to talk to Cash on the telephone. Thornton went on to testify that he believed it was in M.V.'s best interest to prevent her from talking with her mother for that entire month. Thornton testified he did this out of his own belief that Cash prevents M.V. from talking to them when she is staying with Cash.

Next, Thornton was questioned by his own attorney. During that questioning, Thornton explained that he and his wife had agreed to the January 2010 custody settlement with Cash and Varney because they believed Varney would be a continuing presence in the household. Thornton explained that he believed Varney's presence was important because Varney provided stability in the family. Thornton went on to testify that he is concerned about Cash's alleged drug use. Thornton also testified that he is concerned that Cash is unemployed because he believed it would prevent her from having the ability to support M.V. When asked if it was in M.V.'s best interest to be primarily in her mother's care, Thornton answered, "Absolutely not." Thornton also testified that, as a result of Cash and Varney's divorce, M.V. was required to change schools and he was concerned about that change. However, Thornton admitted he had no idea of the quality of M.V.'s new school.

### 4. *Mrs. Thornton's testimony*

Debra Dempsey Thornton was the final witness to testify during the bench trial. Dempsey Thornton began by explaining why she and her husband had agreed to the January 2010 custody settlement. Among their reasons was that the settlement kept M.V. in their lives and as a result, they would know if she was okay. Dempsey Thornton also testified she agreed to the custody settlement because she assumed Cash and Varney would remain together and as a result, Varney would continue to maintain control and a watch on Cash. Dempsey

11

Thornton voiced concern about both M.H.V.'s and M.V.'s safety in Cash's home. Dempsey Thornton testified she is very concerned about M.H.V.'s internet postings and she worries whether M.H. had been exposed to them.

Dempsey Thornton also testified regarding M.V.'s ongoing therapy at DePelchin Children's Center. Dempsey Thornton acknowledged that Cash and Varney had originally placed M.V. in therapy at DePelchin several years prior to the January 2010 custody settlement. According to Dempsey Thornton, M.V.'s original therapist was Mollie Robins. Dempsey Thornton testified that she and her husband went to DePelchin to speak with Robins, and she would not speak to them about M.V.'s therapy. According to Dempsey Thornton, Robins terminated her therapeutic relationship with M.V. soon thereafter. Once Robins had withdrawn, Dempsey Thornton and her husband arranged, without consulting Cash or Varney, for M.V. to start seeing a new therapist at DePelchin. According to Dempsey Thornton, the new therapist spoke with them, as well as both Cash and Varney, when she started seeing M.V.

Dempsey Thornton was then asked about Cash's effort to enroll M.V. in a dance class that met on Thursdays. Dempsey Thornton testified that on Thursdays M.V. is in their custody and that is the day she goes to her therapy sessions. According to Dempsey Thornton, Cash agreed with her that M.V. needed to continue her therapy. During cross-examination by Varney's attorney, Dempsey Thornton admitted she did not know if therapy sessions were available on days other than Thursday because she had never felt the need to check. Dempsey Thornton testified that, while it might be possible for M.V. to go to therapy on a day other than Thursday, Thursday was the only day when the Thorntons could take her. Despite the fact that Cash and Varney agreed M.V. needed therapy, had occasionally taken her to the Thursday therapy sessions, and had been responsible

12

for initiating her therapy and making sure she got to her sessions with Robins for three years, Dempsey Thornton did not believe Cash and Varney would take M.V. to therapy if it was scheduled on a day other than Thursday.

Dempsey Thornton was also asked about M.V.'s visits to her home at a time when she and Thornton were living in the same house but were not married. Dempsey Thornton said her situation was different from Cash allowing Roberts to stay overnight because they "didn't sleep in the same bed in front of [M.V.] and . . . [they] did not have sex in that house with [M.V.] there." Dempsey Thornton continued that she believed Cash allowing Roberts to stay overnight would confuse M.V. because she wanted M.V. "to have better morals than that." Dempsey Thornton agreed, however, that both sides in the custody dispute were trying to instill religious and moral values in M.V.

Dempsey Thornton also testified she was very concerned about the environment M.V. was being exposed to at Cash's residence. Dempsey Thornton testified she was concerned about Cash's past erratic behavior as well as her current relationship with Roberts. Dempsey Thornton continued that, as a result of their postings on the internet, she was concerned about M.V. being left alone with M.H.V. and Roberts' teenaged son, J.R. In addition, Dempsey Thornton testified she was concerned about M.V.'s safety because she believed Cash had previously left M.V. in the care of Dennis Wayne Jackson. Dempsey Thornton testified she believed Jackson had been shot and killed by the Pasadena police following a bank robbery.

## C. The trial court's questions and ruling

Following Dempsey Thornton's testimony, the trial judge asked if any of the parties objected to him asking Varney a few questions. When none did, the judge asked about Varney's availability on Thursday and Sunday evenings. The judge

13

also asked about who takes care of M.H.V. and M.V. when they are in his custody and he is at work. Varney answered that he is available on both Thursday and Sunday evenings and he hires a lady to watch the children when he is at work. The trial judge then inquired if Varney wanted an expanded possession order, which would entail Thursday and Sunday overnight stays. Varney agreed that he did. The trial judge then announced: "All right. Well, I don't think I need to visit with the child. I'm ready to make a ruling if you'd like."

In the Final Decree of Divorce and Order on Petition to Modify Parent-Child Relationship ("Final Divorce Decree"), the trial court named Cash and Varney joint managing conservators of M.V. and gave Cash the exclusive right to determine her primary residence. The trial court removed the Thorntons as joint managing conservators and instead, designated them possessory conservators. The trial court also permanently enjoined Cash and Varney from:

> Permitting the children to spend the night in the same residence as any person of the opposite sex, who is unrelated to the children by blood or marriage, with whom the party is having an intimate relationship, and, as applied to Amanda Cash, specifically but not limited to Bruce Roberts and [J.R.]. As applied to this paragraph, "the night" is defined as between the hours of 9:00 p.m. and 8:00 a.m.

Finally, the trial court ruled that the Thorntons should pay a portion of Cash's reasonable and necessary attorney's fees incurred in defending the Thorntons' intervention, as well as the reasonable and necessary attorney's fees incurred by the amicus attorney.

The Thorntons timely requested that the trial court make findings of fact and conclusions of law, which it did on October 31, 2011. In addition, the Thorntons filed a motion for new trial, which the trial court overruled by written order. The Thorntons filed their notice of appeal on December 15, 2011. On January 25, 2012, the trial court signed "Nunc Pro Tunc Temporary Orders Pending Appeal

(Thornton)" ("Temporary Orders"), which awarded the Thorntons additional periods of possession of M.V. pending the outcome of the appeal.

## MOTION TO DISMISS

Before we address the issues raised by the Thorntons in their appeal, we must consider the motion to dismiss filed by Cash. Cash contends we should dismiss the Thorntons' appeal because they filed a "Motion for Enforcement of Post Judgment Temporary Orders and Order to Appear" on July 2, 2012. The motion asked the trial court to hold Cash in contempt for (1) failing to surrender M.V. to the Thorntons for a visitation required under the Temporary Orders; (2) failing to surrender M.V. to the Thorntons for two visitations required by the Final Divorce Decree; and (3) violating the permanent injunction found in the Final Divorce Decree prohibiting Roberts and J.R. from being in her residence between the hours of 9:00 p.m. and 8:00 a.m. According to Cash, by seeking to enforce provisions found in the Temporary Orders and the Final Divorce Decree, the Thorntons have accepted the benefits of the order they are seeking to reverse on appeal and, as a result, their appeal must be dismissed.

In support of her motion, Cash cites numerous cases, including *Carle v. Carle*, 234 S.W.2d 1002, 1004 (Tex. 1950). In *Carle*, the supreme court held that "a litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot afterward prosecute an appeal therefrom." *Id.* There are two exceptions to the doctrine: (1) when acceptance results from economic necessity; and (2) when a reversal of the judgment will not affect the appellant's rights to the benefit they have received. *Waite v. Waite*, 150 S.W.3d 797, 804 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Cash contends neither exception applies because the present case does

15

not deal with any "pecuniary interest," and the Thorntons' rights and terms of possession and access could be affected if the case is reversed on appeal.

We conclude Cash has not met her burden to establish that the acceptance of the benefits doctrine applies to the facts presented here. *Gathe v. Gathe*, 376 S.W.3d 308, 313 (Tex. App.—Houston [14th Dist.] 2012, no pet.). First, the cases Cash cites are distinguishable because none involves the application of the acceptance of benefits doctrine to dismiss an appeal involving child custody issues. *See Texas State Bank v. Amaro*, 87 S.W.3d 538, 544 (Tex. 2002) (holding exception to acceptance of benefits doctrine applied in trust dispute); *Carle*, 234 S.W.2d at 1004 (divorce case involving dispute over property division); *Waite*, 150 S.W.3d at 804 (holding doctrine applied in divorce case because appellant accepted a substantial portion of the judgment being appealed); *Kline v. O'Quinn*, 874 S.W.2d 776, 780 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (dispute between three attorneys over a contingency fee). Instead, as these cases demonstrate, the doctrine is most commonly applied in divorce cases in which one spouse accepts certain assets awarded by the judgment and then seeks to appeal the remainder of the judgment. *Gathe*, 376 S.W.3d at 313.

While the present case does involve a divorce and property settlement, this appeal does not relate to those provisions of the Final Divorce Decree. Instead, it arises solely out of the trial court's decisions regarding M.V. In child custody cases, the primary consideration of any court is the best interest of the child. *See* Tex. Fam. Code Ann. § 153.002 (West 2008). It is this overarching consideration that distinguishes the present case from those cited by Cash in her motion to dismiss.

The Family Code specifically authorizes an appeal from a final order such as the Final Divorce Decree. *See id.* § 109.002(b) (West 2008). It also provides that

an appeal does not automatically suspend the appealed order. *See id.* § 109.002(c) (West 2008). Because the appeal did not automatically suspend the decree, and neither the trial court nor this Court signed an order suspending it, the decree remained in full effect and was enforceable by contempt proceedings. *Ex parte Rutherford*, 556 S.W.2d 853, 854 (Tex. Civ. App.—San Antonio 1977, orig. proceeding). Moreover, the Legislature has authorized a trial court to enter temporary orders during the pendency of an appeal. *See id.* at § 109.001. The Family Code states that a trial court retains jurisdiction to enforce those temporary orders. *See id.* § 109.001(b). Because the Final Divorce Decree and the Temporary Orders remain in effect during the pendency of this appeal, Cash has a statutory duty to comply with those orders during that time period. *Velasco v. Ellis*, No. 01-10-00073-CV, 2011 WL 2118865 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.).

Here, the trial court determined it was in M.V.'s best interest to sign the Final Divorce Decree, which changed the Thorntons' status from joint managing conservators to possessory conservators and awarded them designated periods of possession. In addition, the trial court, in its Final Divorce Decree, decided it was in M.V.'s best interest to prohibit Roberts and J.R. from being in Cash's residence between the hours of 9:00 p.m. and 8:00 a.m. The trial court also determined it was in M.V.'s best interest to sign the Temporary Orders, which awarded the Thorntons increased periods of possession during the pendency of the appeal.

We conclude the Thorntons' efforts to enforce the trial court's determination of what was in the best interest of M.V., as embodied in the Final Divorce Decree and Temporary Orders, and to ensure that Cash fulfilled her continuing statutory duties under those orders, does not invoke the acceptance of the benefits doctrine. *See McAlister v. McAlister*, 75 S.W.3d 481, 483–84 (Tex. App.—San Antonio

2002, pet. denied) (holding when temporary orders pursuant to section 6.709(a) of the Family Code are in place, acceptance of benefits doctrine does not apply because it would abrogate "the legislature's intent to maintain the status quo and provide for spousal and child support, as necessary, during the appeal."). Applying the doctrine here would encourage parties to disregard a trial court's orders in suits affecting the parent-child relationship that have been appealed and thereby thwart the Legislature's directive that the best interest of the child is the primary consideration in those proceedings. Cash's motion to dismiss is denied.

## THE THORNTONS' ISSUES ON APPEAL

The Thorntons raise five issues on appeal, which we consolidate into three. The Thorntons' first issue contends the trial court improperly applied a parental presumption in a modification proceeding and that, as a result of the improper application of that presumption, it erred when it decided to remove them as joint managing conservators. In their second issue, the Thorntons assert the trial court erred when it excluded M.V.'s objectives from the trial and prevented the amicus attorney from full participation in the trial. In their third and final issue, the Thorntons contend the trial court erred in assessing the amicus attorney's fees and a portion of Cash's attorney's fees against them.

**I.** **The trial court did not apply a parental presumption, and its decision to remove the Thorntons as managing conservators is supported by sufficient evidence.**

In their first issue, the Thorntons assert the trial court improperly applied a parental presumption in the modification proceeding. In addition, within their first issue, the Thorntons contend "there was no evidence of a change of circumstances that would warrant taking away [the Thorntons'] Joint Managing Conservatorship and their rights, powers and duties." The Thorntons go on to argue that as a result

of this erroneous application of a parental presumption, the trial court erroneously removed them as joint managing conservators.

## A. Standard of review and applicable law

Most orders arising from a suit affecting the parent-child relationship will not be disturbed on appeal unless the complaining party can demonstrate a clear abuse of discretion. *In re C.A.M.M.*, 243 S.W.3d 211, 214 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Generally, a trial court abuses its discretion by acting arbitrarily, unreasonably, or without reference to any guiding rules or principles. *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The failure to analyze or apply the law correctly also constitutes an abuse of discretion. *In re C.A.M.M.*, 243 S.W.3d at 215. The fact a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate an abuse of discretion. *Id.* A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision. *In re R.T.K.*, 324 S.W.3d at 900. In addition, a trial court is in the best position to observe the witnesses and their demeanor, and therefore is given great latitude in determining a child's best interests. *In re Guardianship of C.E.M.-K*, 341 S.W.3d 68, 80 (Tex. App.—San Antonio 2011, pet. denied).

When the proper standard of review is abuse of discretion, challenges to the legal and factual sufficiency of the evidence are not independent grounds for reversal, but instead are factors to be considered in determining whether the trial court abused its discretion. *In re C.A.M.M.*, 243 S.W.3d at 220–21. To determine if the evidence is legally sufficient, we review the entire record, considering evidence favorable to the finding if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* In addition, we

indulge every reasonable inference that would support the factfinder's finding. *In re Guardianship of C.E.M.-K*, 341 S.W.3d at 80. In a legal sufficiency review, the factfinder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *2900 Smith, Ltd. v. Constellation NewEnergy, Inc.*, 301 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *In re Guardianship of C.E.M.-K*, 341 S.W.3d at 80.

In reviewing factual sufficiency, we must examine the entire record, considering evidence both in favor of and contrary to the challenged findings. *Id.* at 81. We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* We cannot substitute our judgment for that of the factfinder. *Id.* If there is sufficient competent evidence to support the factfinder's decision, it must be upheld. *Id.* We may not weigh the witnesses' credibility or interfere with the factfinder's resolution of conflicts in the evidence. *In re C.A.M.M.*, 243 S.W.3d at 221.

After assessing the sufficiency of the evidence, we determine whether, based on the evidence, the trial court made a reasonable decision. We will affirm the decision unless it is arbitrary or unreasonable. *Id.*

The presumption that the best interest of the child is served by awarding custody to the parent is deeply embedded in Texas law. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). The parental presumption, codified in Chapter 153 of the Family Code, provides that the trial court must appoint a parent as sole managing conservator or both parents as joint managing conservators unless that appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a) (West 2008).

20

The supreme court has held that the parental presumption does not apply in modification suits brought under Chapter 156 of the Family Code. *In re V.L.K.*, 24 S.W.3d at 342–43. Instead, modification proceedings are governed by a statutory scheme distinct from the statutory scheme controlling original custody determinations. *See* Tex. Fam. Code Ann. § 156.101(a) (West Supp. 2012). Although the two types of custody proceedings are governed by distinct statutory schemes, both share one overriding concern: the best interest of the child. *In re R.T.K.*, 324 S.W.3d at 900. A modification suit introduces additional policy concerns not present in an original custody action, such as stability for the child and the need to prevent constant litigation in child custody cases. *Id.* Thus, a person seeking to modify an existing custody order must prove that (1) a modification would be in the child's best interest, and (2) the circumstances of the child, a conservator, or other party affected by the custody order, have materially and substantially changed since the previous custody order. *Id.*

## B.    Analysis

It is undisputed that this is a modification proceeding brought under Chapter 156 of the Family Code. While all parties agree that the parental presumption is inapplicable, the Thorntons contend the only explanation for the trial court's decision in this case is it must have improperly applied that presumption. The Thorntons also assert there was no evidence that the circumstances of the child, a conservator, or other party affected by the custody order have materially and substantially changed since the entry of the original custody order. Finally, the Thorntons assert the evidence is overwhelming that "Cash is and was not an appropriate Primary Conservator," and contend there was no evidence that appointing the Thorntons primary joint managing conservators would not be in M.V.'s best interest.

21

We turn first to the Thorntons' contention that the trial court improperly applied a parental presumption in this modification proceeding. In a bench trial, we presume that a judge conscientiously performs his duties of responsibly assessing the credibility of the witnesses, logically evaluating the evidence, rationally resolving any factual disputes, and correctly applying the law to the facts. *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 251 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). We need not rely on this presumption here, however, because the parties' pleadings, the trial court's Final Divorce Decree, and the court's Findings of Fact and Conclusions of Law all show that this case was litigated, tried, and resolved as a suit to modify an existing custody order pursuant to Chapter 156 of the Family Code. Because we conclude the Thorntons' contention that the trial court improperly applied a parental presumption in a modification proceeding is incorrect, we construe their consolidated first issue as a challenge to the sufficiency of the evidence to meet the statutory requirements for modification. *See In re C.A.M.M.*, 243 S.W.3d at 220.

The Thorntons next contend there is no evidence that the circumstances of the child, a conservator, or other party affected by the original custody order have materially and substantially changed since the entry of the original custody order. We conclude the Thorntons are barred from making this argument on appeal because they judicially admitted a substantial change. Specifically, the Thorntons made that precise allegation in both their petition in intervention and their counter petition for modification. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d 887, 905 (Tex. 2000) (stating that a judicial admission occurs when an assertion of fact is conclusively established in a live pleading). Because the Thorntons judicially admitted that a material and substantial change had occurred, they are barred from disputing it on appeal. *Id.*

22

Even if the Thorntons had not judicially admitted the existence of a material and substantial change of circumstances, we conclude there is abundant evidence of such a change since the entry of the original custody order. Specifically, Cash and Varney, M.V.'s mother and father, were getting divorced. Just as the marriage of a party may constitute a material and substantial change in circumstances sufficient to warrant the modification of a custody order, we conclude the divorce of two of the parties to the original custody order meets that requirement as well. *See Arredondo v. Betancourt*, 383 S.W.3d 730, 734–35 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (detailing non-exclusive list of material changes found to be sufficient to support modification of a custody order).

The Thorntons argue that Cash's divorce filing does not constitute a substantial change in circumstances sufficient to warrant a modification of the January 2010 custody order. Instead, they argue, the divorce was part of an effort by Cash to manipulate events to create the appearance of a change in circumstances. In making this argument, the Thorntons invite this court to reweigh the evidence heard by the trial court and render a different decision.

We reject this invitation. This was a bench trial, and in that circumstance, the trial judge is in the best position to observe and assess the witnesses' demeanor and credibility, to sense the forces, powers, and influences that may not be apparent from reading the record on appeal. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). As a result, an appellate court defers to a trial court's resolution of underlying facts and to credibility determinations that may have affected its determination, and will not substitute its judgment for that of the trial court. *Id.* The trial court heard the evidence and the arguments of counsel and found that a material and substantial change had occurred sufficient to warrant modifying the January 2010 custody order. The

23

Thorntons have not pointed to any evidence in the record that, for example, Cash was planning to file for divorce at the time of the January 2010 custody order. Nor have they pointed to any other evidence showing that the trial court abused its discretion when it found a material and substantial change.[6]

Finally, the Thorntons address the best interest of M.V. We conclude that the trial court had sufficient evidence to support its decision to change the Thorntons' status from joint managing conservators to possessory conservators. Here, the trial court specifically found that the Thorntons only requested possession of and access to one of the two siblings, M.V. The court also found that "it is not in the best interest of the child [M.V.], or the child [M.H.V.], that the children continue to be separated during the periods when [M.V.] would have a standard possession order with [the Thorntons], which do not include the child's sibling, [M.H.V.]." These findings were supported by the Thorntons own testimony that they were not interested in M.H.V., as well as both Cash and Varney's testimony that both M.V. and M.H.V. were being negatively affected by M.V.'s time with the Thorntons. Because keeping siblings together is a factor a trial court may consider when deciding the best interest of the child, we conclude this finding by the trial court is sufficient to support its decision that it was in M.V.'s best interest to change the Thorntons' status from joint managing conservators to possessory conservators. *See* Tex. Fam. Code Ann. § 153.251(c) (West 2008); *MacDonald v. MacDonald*, 821 S.W.2d 458, 463 (Tex. App.—

---

[6] The Thorntons also argue we should reverse the trial court's judgment because the trial court applied an improper legal standard—that the January 2010 custody order had become unworkable—in finding that modification was proper. Assuming without deciding that unworkability is not an appropriate legal standard, we conclude any error was harmless because unworkability was an additional ground for modification; the trial court also found that a material and substantial change in circumstances warranting modification had occurred.

Houston [14th Dist.] 1992, no writ) (holding split custody is factor in determining best interest of child).

To the extent the Thorntons point to evidence they believe is contrary to the trial court's decision in this matter, we again point out that in a bench trial, the court is the trier of fact and we may not reevaluate the witnesses' credibility or reweigh their testimony. A trial court does not abuse its discretion when, as here, there is some evidence of a substantive and probative character to support its decision. *In re R.T.K.*, 324 S.W.3d at 900.

The Thorntons also focus on Cash's prior drug problems and her admission during the bench trial that she takes three prescription medications. The Thorntons ask this Court to take judicial notice of the purposes for prescribing two of those prescription drugs, Soma (a muscle relaxer used for pain management) and Suboxone (used for opioid dependence), and they attached various documents to their appellate brief in an effort to establish their purpose. They also invite this Court to consider the results of a drug test administered to Cash on January 13, 2012, more than four months after the trial court signed the Final Divorce Decree.

With respect to the drug test results, it is well established that, when reviewing the merits of a trial court's decision, we are limited to considering the material that was before the trial court at the time it acted. *Methodist Hosps. of Dallas v. Tall*, 972 S.W.2d 894, 898 (Tex. App.—Corpus Christi 1998, no pet.) (citing *Univ. of Tex. v. Morris*, 344 S.W.2d 426, 429 (Tex. 1961)). Because the drug test results were not before the trial court when it signed the appealed Final Divorce Decree, we cannot consider them on appeal. *Id.*

Assuming without deciding we may take judicial notice of the purposes of the two prescription drugs, doing so would not change the outcome. The trial court was aware of Cash's prior drug issues, her current efforts to ensure those problems

25

did not recur, as well as her admitted use of the referenced prescription drugs. With that knowledge, the trial court decided to retain Cash as a joint managing conservator of M.V. and to change the Thorntons' status to that of possessory conservators.[7] Even when considering the purposes of the two drugs, we cannot conclude that the trial court abused its discretion when it did so. We overrule the Thorntons' first issue on appeal.

## II. The trial court did not abuse its discretion in deciding not to interview M.V., and no party objected to the court's limits on the amicus attorney's role.

In their second issue, the Thorntons contend the trial court erred in two ways concerning the role of the amicus attorney in this case. First, they assert the trial court erred when it declined to interview M.V. regarding her objectives. Second, they argue the trial court erred when it allegedly excluded the amicus attorney from full participation in the trial by stating: "I don't see any reason for the AMICUS to make objections. Everybody has good lawyers." We address each contention in turn.

Section 153.009(a) of the Family Code provides that in a bench trial "the court . . . may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence." Tex. Fam. Code Ann. § 153.009(a) (West 2008). This statute gives the court discretion to interview a child under twelve, but it does not require the court to do so. M.V. was ten at the time of the bench trial. Therefore, the trial court had the discretion to decide whether to interview her or not. The Thorntons have not pointed to any evidence

_____

[7] The Thorntons also argue Cash's admission that she was taking Suboxone violates the conditions imposed by the Texas Board of Nursing's Reinstatement Agreed Order. Although that order prohibited Cash from using any controlled substances, we note it allowed Cash to use a controlled substance "prescribed by a licensed practitioner for a legitimate purpose."

in the record that establishes the trial court abused its discretion when it opted to not interview M.V. As a result, we reject the Thorntons first contention in their second issue . *See Wiegman v. Weigman*, No. 03-05-00025-CV, 2006 WL 305272, at *2 (Tex. App.—Austin 2006, no pet.) (mem. op.) (holding trial court did not abuse its discretion when it chose not to interview a child under twelve).

Turning to their second contention, the Thorntons complain that the trial court prevented the amicus attorney from fully participating in the bench trial when he stated, following several objections lodged by different attorneys to the same testimony, that he did not see any reason for the amicus attorney to make objections. No one, including the Thorntons, objected to the trial court's ruling. Because the Thorntons did not object, they failed to preserve this complaint for appellate review. *See Tucker v. Thomas*, No. 14-09-01081-CV, 2011 WL 6644710, at *15 (Tex. App.—Houston [14th Dist.] 2011, pet. filed) (en banc) (holding appellant failed to preserve litany of alleged errors because he did not raise them in the trial court). We therefore overrule the Thornton's second issue.

**III. The trial court did not abuse its discretion by ordering the Thorntons to pay the amicus attorney's fees and a portion of Cash's attorney's fees.**

In their third issue on appeal, the Thorntons complain about the trial court assessing both the amicus attorney's fees and a portion of Cash's attorney's fees against them. We turn first to the amicus attorney's fees.

The Thorntons assert the trial court abused its discretion in two ways when it ordered them to pay the amicus attorney's fees. First, because the Thorntons are not parents, they argue that the trial court abused its discretion when it classified the amicus attorney's fees as necessaries for the benefit of the child. Second, the Thorntons contend the trial court abused its discretion because the evidence is insufficient to support its decision to assess all of the amicus attorney's fees against

them. In response, Cash contends the Thorntons failed to preserve these arguments for appellate review because they did not raise them in the trial court.

With respect to the Thorntons' first argument, we agree. The record on appeal demonstrates that the Thorntons' only complaint about the trial court's award of the amicus attorney's fees came in their motion for new trial, where they asserted the evidence was legally and factually insufficient to support a finding that the Thorntons should pay all of the amicus attorney's fees. Because they made no complaint in the trial court that it was an abuse of discretion to assess the amicus attorney's fees against them as necessaries for the benefit of the child, we conclude they failed to preserve this argument for appellate review. Tex. R. App. P. 33.1(a); *see Arredondo*, 383 S.W.3d at 746–47 (holding appellant failed to preserve complaint that she was deprived of a jury trial on attorney's fees because she failed to raise it in the trial court); *Tucker*, 2011 WL 6644710, at *15 (holding appellant failed to preserve complaints regarding trial court's order to pay half of amicus attorney's fees because he did not raise that issue in the trial court); *In re A.B.P.*, 291 S.W.3d 91, 99–100 (Tex. App.—Dallas 2009, no pet.) (holding appellant failed to preserve complaint regarding classification of attorney's fees as "in the nature of child support" by not raising it in the trial court).

We construe the Thorntons' second argument as a challenge to the sufficiency of the evidence supporting the trial court's decision to assess all of the amicus attorney's fees against them. In support of their sufficiency challenge, the Thorntons point to the procedural history of the litigation. Specifically, without citing to the appellate record, the Thorntons contend

> Cash sued Appellants seeking primary conservatorship. Cash and Varney subsequently sued Appellants seeking removal [of] Appellants as conservators. Varney sued Cash for custody and the uncontradicted evidence reflects he continued to pursue custody until

28

> a few weeks before trial and to some degree, into trial. Appellants['] Intervention (nominally a counterclaim to Cash's divorce action) was a responsive pleading to being sued by Cash.

Then, without citing any authority, the Thorntons assert that "it was error for the trial court to assess the entirety of the Amicus Fees against [them]."

The record does not support the Thorntons' version of this case's procedural history. While it is true that Cash initiated the latest round of litigation, she did so in an Original Petition for Divorce. In that petition, Cash asked the trial court to incorporate the January 2010 Agreed Order in Suit Affecting Parent-Child Relationship. In response to Cash's divorce petition, in addition to an original answer, the Thorntons filed a Petition in Intervention for Conservatorship in which they alleged there had been a material and substantial change of circumstances since the rendition of the January 2010 Agreed Order and as a result, they sought additional periods of possession. It was not until five months after the Thorntons intervened that Cash and Varney filed their Joint Motion to Modify Parent-Child Relationship, which sought to remove the Thorntons as conservators of M.V. Thus, it was the Thorntons who first sought to change the January 2010 order regarding custody and possession. We conclude that this procedural history is sufficient to support the trial court's exercise of its statutory authority to order the Thorntons to pay all of the amicus attorney fees. *See* Tex. Fam. Code Ann. § 107.023 (West 2008) (authorizing trial court to order one or more of the parties to pay an amicus attorney's fees and to classify them as necessaries for the child).

We turn now to the Thorntons' contention that the trial court abused its discretion when it ordered them to pay a portion of Cash's attorney's fees. The Thorntons once again argue that, under their version of the procedural history of the litigation, it was an abuse of the trial court's discretion to order them to pay a portion of Cash's attorney's fees. For the same reasons stated above with respect

to the amicus attorney's fees, we disagree. Instead, the procedural history found in the appellate record is sufficient to support the trial court's decision to order the Thorntons to pay a portion of Cash's attorney's fees. *See In re R.C.S.*, 167 S.W.3d 145, 152 (Tex. App.—Dallas 2005, pet. denied) (rejecting argument that trial court abused its discretion by ordering appellant to pay appellee's attorney's fees even though appellant believed the litigation was caused by appellee's own actions).[8]

Having addressed and rejected each argument raised by the Thorntons in their third issue, we overrule that issue.

## CONCLUSION

The trial court's Final Decree of Divorce and Order on Petition to Modify Parent-Child Relationship is affirmed.

/s/    J. Brett Busby
        Justice

Panel consists of Chief Justice Hedges and Justices Brown and Busby.

---

[8] The Thorntons also argue that ordering them to pay Cash's attorney's fees was an abuse of discretion because the trial court erred in changing their status from managing to possessory conservators. Because we have affirmed the trial court's decision to remove the Thorntons as managing conservators, we reject this argument. *See In re R.C.S.*, 167 S.W.3d 145, 152 (Tex. App.—Dallas 2005, pet. denied) ("Appellant's contention that appellee should not have succeeded in her attempt to modify the conservatorship arrangement does not persuade us that the trial court abused its discretion in awarding her attorney's fees.").