# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00457-CV

---

**Luke Aaron Dillon, Appellant**

**v.**

**Christina Sarah Bamford, Appellee**

---

### FROM THE 425TH JUDICIAL DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 19-2055-F425, THE HONORABLE BETSY F. LAMBETH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Luke Aaron Dillon appeals the district court's orders denying his petition to modify the parent-child relationship and granting in part and denying in part his motion for enforcement of his agreed divorce decree with appellee Christina Sarah Bamford. In four issues on appeal, Dillon argues that the district court abused its discretion by: (1) finding that there was no material and substantial change in circumstances sufficient to modify the terms of conservatorship in the manner requested by Dillon; (2) making other changes to the terms of conservatorship that were not supported by the evidence; (3) awarding Dillon the right to claim the couple's three children as dependents for income tax purposes in 2026 rather than 2019, contrary to the terms of the divorce decree; and (4) finding that there was insufficient evidence that Bamford had violated the divorce decree by claiming the children in 2021. For the

following reasons, we will affirm the district court's orders in part and reverse and render them in part.

## BACKGROUND

Dillon and Bamford married in 2012 and had three children together: J.A.D. ("Joe"), born in 2012; K.R.D. ("Kristen"), born in 2015; and J.Z.D. ("Jack"), born in 2017.[1] Dillon and Bamford divorced in 2019 pursuant to an agreed divorce decree. Among other provisions, the decree named Dillon and Bamford as joint managing conservators, with Bamford having the exclusive right to designate the primary residence of the children within Williamson County and the exclusive right to receive periodic child-support payments. Both Dillon and Bamford shared the right, among others, "subject to the agreement of the other parent conservator, to consent to psychiatric and psychological treatment of the children."

Regarding liability for federal income taxes, the decree awarded Dillon "the sole right to claim the children as dependents for income tax purposes on [his] income tax returns for odd-numbered years beginning with the calendar year 2019." The decree similarly awarded Bamford "the sole right to claim the children as dependents for income tax purposes on [her] income tax returns for even-numbered years beginning with the calendar year 2020."

In 2023, Dillon filed a petition to modify the parent-child relationship, seeking to be named joint managing conservator with the exclusive right to designate the primary residence of the children and to serve as the "tie breaker" in the event that he and Bamford could not agree on decisions relating to the children's care and education. Dillon also filed an amended motion to enforce the divorce decree, alleging that Bamford had "violated the decree twice by claiming

---

[1] For the children's privacy, we refer to them using pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

2

the children as dependents for tax purposes in the following two tax years, 2019 and 2021, which were explicitly designated as [Dillon's] years to claim the children."

The case proceeded to a final hearing on modification and a separate hearing on enforcement. At the modification hearing, Dillon and Bamford each testified. Dillon testified that there had been "some friction" between him and Bamford since the divorce and that Bamford would insult him and use profanity when communicating with him in text messages and social-media posts. Additionally, in one communication with Jack's school, Bamford had accused Dillon of domestic violence and "angry violent behavior," which she blamed for Jack's "severe outbursts of physical [and] verbal aggression."

Dillon further testified that Bamford was inadequately "coparenting" with him. He explained, "There's a lot of examples or times that she didn't coparent, was pretty much fighting me any time I would try to coach my children, arguing about any time we wanted to trade days." Dillon claimed that Bamford was neglecting her duties as parent. According to Dillon, Bamford had attended "maybe a few," if any, of the children's social events such as birthday parties; was not taking the children to their doctor's appointments and was ignoring their medical care and dental hygiene; and had kept drugs in her home where the children had easy access to them.

Bamford testified that she was now married to another man who had four minor children of his own plus an adult daughter, that she had been unemployed since December 2023, and that her only source of income apart from her husband was child support. Bamford testified that she did not use any illegal drugs but had used Delta-8 THC, a legal drug, two years ago. She admitted that Kristen had at one point gotten into her Delta-8 gummies. Bamford also testified that she had allowed the children to "wander" their neighborhood without supervision. She

3

described the neighborhood as "a regular suburban neighborhood, stone wall in Liberty Hill. It's the neighborhood that their school is in. Lots of families, lots of kids, lots of kids riding their bikes, playing basketball in the street." Bamford acknowledged that on one occasion, the children were in a go-cart accident in which Kristen was riding in the passenger seat, but she suffered no injuries, and on another occasion, Bamford had allowed Jack to ride with her husband on a motorcycle without a helmet. Bamford also admitted that she had left Kristen at home without adult supervision, although she clarified that her oldest son was with Kristen at the time. Bamford further testified that she had not taken the children to the dentist, but this was because Dillon had told her that he "wanted to handle that." Bamford also acknowledged that she had not vaccinated the children, but this was a decision she and Dillon had made together during their marriage.

Bamford agreed that she and Dillon did not always have the best co-parenting arrangement, but she testified that there were times when they were able to work together and communicate regarding the children. She also testified that she took the children to birthday parties and play dates. Regarding her text messages in which she used profanity to communicate with Dillon, Bamford testified that he did the same when communicating with her, calling her such names as "a cheap whore" and "a dumb bitch." She also testified that she never cursed or bad-mouthed Dillon in front of the children.

Bamford acknowledged that she had not reimbursed Dillon for the children's medical expenses. However, she also testified that Dillon owed her over $30,000 in child support, which adversely affected her ability to reimburse the children's medical expenses. Bamford further testified that all three children were in therapy, that she and Dillon were equally responsible for paying for Joe's therapy, and that Dillon was paying for the other two children's

4

therapy "on his own" because she did not agree with Dillon that the other two children needed therapy. However, according to Bamford, beginning in November 2024, Dillon had stopped taking the children to therapy.

Bamford denied Dillon's claim that the children had hygiene issues while they were in her care. Bamford acknowledged that Dillon handled most of the children's dental appointments but that with orthodontic and ENT visits, they have "both taken them but especially recently I've taken them on almost all of the ortho and ENT." She added, "We've equally taken them to therapy, speech therapy. Sick visits I take them on my weeks if something happens, an accident happens and they need to go to the doctor while with me, I take them, things like that."

When asked what she wanted the district court to do, Bamford testified, "Essentially just let things stay the same and we just continue with our 50/50 and we work at coparenting like we had been." Although there were "little things in the order" that she would like to see changed, she believed that the order should "remain as is."

The only other witness to testify at the hearing was Aaron Culp, the children's guardian ad litem. Culp testified that he had "spent quite a bit of time with" the children and "can see that both of these parents have done a very good job of raising these children to be polite, respectful, very cordial, compassionate children." Although the children exhibited sibling conflict and rivalry, he saw "nothing that suggests anything, you know, out of the ordinary. Both parties, I believe, provide safe, clean environments for these children."

Regarding safety issues at Bamford's home, Culp testified that "there have been a few safety issues that I have been made aware of and investigated and there are some things that

5

are concerning but nothing in my mind that would rise to the level of needing any kind of dramatic change to these schedules for these kiddos." He explained,

> When I have spoken to them about their desires, their wants, what they want out of this, they have all been very consistent that they want their schedules to remain the same. They are very clear, very adamant that they want their time exactly the way it is and it's not—I did not ever get the sense that that was being unduly influenced by either parent. . . .

> Again, I'm not seeing anything in my view that would warrant a change based on safety. I think there are opportunities at both parents' houses to suffer injuries, to be frank. There's four-wheelers and dirt bikes at dad's house and there's go-carts and motorcycles at mom's house. These kids, they remind me of when I grew up in the early 90s, like get yourselves out the door, you're going to be gone in the neighborhood, come back for lunch, come back for dinner, you know, it was more of a permissive thing, I think that runs through both families.

Regarding the parties' abilities to coparent, Culp acknowledged that "there is conflict there" and that "both parents can be very aggressive with one another." Culp also testified that there was an issue with each parent "scheduling therapy, medical, dental appointments for the kids without notifying the other parent." Culp believed "that both of them need to be making each other aware explicitly of all of those appointments, scheduling them in advance with the other parent's knowledge." However, Culp added that "there's not a sense that one parent is deficient in any way, that one parent is not pulling their weight," and that "there were several examples of these parenting conflicts that they were able to resolve and both parents are very, very actively involved in school and in these children's medical appointments."

Culp also expressed concerns with the children missing their therapy appointments while in Dillon's care and believed that all three children should continue to see their therapist regularly. He testified that "the parents should both make sure that that happens

6

but I think to the extent that we need a tiebreaker in this case, it is going to be therapy and that if the parents are not able to agree, that that should go to mom." Culp also recommended that both parents attend coparenting therapy.

Finally, Culp opined on the children's extracurricular activities. He testified that "the parents were scheduling extracurricular activities during the other parent's time" and that this should "only be with the written permission of the other parent." He explained that both the school-aged children "are very involved in extracurriculars" and "both parents coach which is fantastic." He did not "want that to stop necessarily but it does create conflict when the parents are doing it around each other so that absolutely should stop as well."

The district court admitted into evidence a copy of Culp's report. In the report, Culp stated that his "major concern for this case is the conflict between the parents" but that "[b]oth Mr. Dillon and Ms. Bamford very clearly love their children" and are "both highly involved and active parents who take a keen interest in their children's education and activities." Culp did not "recommend any change to the current possession schedule" and "would not recommend a change to the rights and duties at this time, except for the right to vaccinate the children," which Culp recommended should belong exclusively to Dillon. Culp also recommended that the parents receive individual therapy and that the children continue to see their therapist at a frequency and duration recommended by the therapist, with the parents being ordered to ensure that the children participate in therapy according to that recommendation.

At the conclusion of the hearing, the district court found that Dillon had failed to satisfy his burden to establish by a preponderance of the evidence a material and substantial change in circumstances sufficient to justify modifying the terms of conservatorship as Dillon had requested. However, despite making a finding that there had been no material and

7

substantial change in circumstances, the district court found that certain modifications to the terms of conservatorship were in the best interest of the children. These modifications included giving Bamford the exclusive right to consent to psychiatric and psychological treatment of the children; the requirement that the children continue to attend therapy with their therapist unless the parents agreed otherwise; limitations on the rights of the parents to enroll their children in extracurricular activities; and a requirement that each parent read the book "BIFF for Co-Parent Communication," written by Bill Eddy.[2] The district court later issued a modification order with these terms.

The case proceeded to a hearing on enforcement. At that hearing, Thomas Mangold, a certified public accountant, testified that he had examined the available tax transcripts from the Internal Revenue Service and tax returns filed by each parent for 2019, 2020, 2021 and 2022. According to Mangold, Bamford improperly claimed the children as dependents in 2019, which resulted in Dillon being "wrongly liable" for $8,774 in taxes.

The 2021 tax situation was more complicated. Mangold explained that "during 2020 when the pandemic was going on, the federal government authorized several programs for economic assistance," and "on the 2021 tax year they paid out some benefits based on the 2020 tax filings and those benefits were paid out to whomever had the children on their 2020 tax return." Mangold continued, "Mr. Dillon was entitled to claim the children on the 2021 tax return and properly did." However, "the benefits that were paid out in 2021, based on the 2020 tax return, went to [Bamford] and because of that, those social security numbers were tied to [Bamford]'s 2021 return." As a result,

---

[2] The district court informed the parties that "BIFF means brief, informative, friendly, and firm."

> [W]hen [Dillon] properly filed his 2021 return claiming the dependents and several other credits that he was entitled to, the IRS stopped the return, stopped the refund, and pulled the return for examination and in fact, assessed additional penalties and interest for underpayment because they denied all of the credits to which he was properly entitled because the children's tax IDs, their social security numbers, were still tied to the 2021 record for [Bamford].

Mangold concluded,

> [S]o although she didn't actually claim them as dependents on her return, she did not follow the IRS guidance requiring her to return that money to the IRS and release her claim for exemption and there were two or three bulletins there put out to practitioners and tax payers that year with instructions on what she should have done when she got money to which she was not entitled so that would have corrected the situation so that [Dillon's] return would not have been stopped and he would have gotten approximately another $27,000 in tax credit refunds that he was properly due for that year.

Mangold added that although the parties could try to re-file their 2021 returns to remedy the situation, "[i]t will take a long time and there's no guarantee that [the IRS] would actually refund the money that they denied him earlier." Mangold acknowledged that the situation was not the result of Bamford improperly claiming the children as dependents in 2021, which he testified she did not do.

Bamford testified that she claimed the children as dependents in 2019 but did not claim them as dependents in 2021. She acknowledged that she had not returned to Dillon any money that she had received from the IRS from her 2019 and 2021 taxes. However, she added that her tax refund for 2021 was approximately $2,200, which was less than the amount she had received previously when claiming the children, so she had no reason to believe that she had received any money to which she was not otherwise entitled.

9

Dillon testified that he was denied tax benefits in 2019 because Bamford had claimed the children as dependents that year. Regarding the 2021 taxes, Dillon testified that he was denied tax benefits that year because Bamford "received benefits" for the children in 2021. He did not testify that Bamford had claimed the children as dependents that year.

At the conclusion of the hearing, Dillon asked that the district court award him "the tax benefits that he would have received had Ms. Bamford followed the original divorce decree. That comes out to, per Mr. Mangold's testimony, $8,774 for 2019 and it was $27,186.35 for 2021 so that comes out to a total of $35,960.35."

Bamford argued in response that "with regard to 2019, our proposal to the Court would just simply be to allow Mr. Dillon a make-up tax year, whatever year is my client's next year to claim the children, that he have the right to claim the children instead." Regarding the 2021 taxes, Bamford asked that Dillon's requested relief be denied. She explained,

> What my client may have received with regard to that tax year does not amount to what Mr. Dillon is alleging he should be entitled to. There was no testimony or evidence specifically as to the breakdown of the amount that they're requesting. There was no breakdown as to what amount would be a tax credit versus what amount would be a reduction of his tax liability or as to what amount would actually be a refund that he was entitled to. It was just a lump sum of what tax benefits he may be entitled to but not what amount he would have been refunded.

The district court found that Bamford had improperly claimed the children as dependents in 2019. However, rather than award Dillon the money that he would have received for that year, the district court accepted Bamford's proposed remedy and awarded Dillon the right to claim the children on his tax return for 2026. Regarding 2021, the district court denied relief altogether. The court explained its ruling as follows:

The Court is limited in its power, its jurisdiction, to make decisions when it involves the Internal Revenue Service. I can enforce the agreement between the parties but that's about it. So the Court finds that Ms. Bamford claimed the children in 2019 when she did not have the right to do so. The remedy for that will be that Mr. Dillon will claim the children for the tax year 2026. The Court finds that there is insufficient evidence to reach a conclusion by a preponderance of the evidence regarding 2021. There's insufficient evidence from the IRS regarding what they would have done, what should have been done, and the burden is on Mr. Dillon to produce a preponderance of the evidence. Additionally, as I stated, the Court is limited in what it can do in regard to the IRS other than to enforce the agreement. The issue with 2021 has nothing to do with the agreement that is contained in the final decree of divorce.

The district court later issued an enforcement order consistent with the above ruling. This appeal by Dillon of both the modification and enforcement orders followed.

## STANDARD OF REVIEW

We review trial court rulings on motions to modify conservatorship and motions to enforce a divorce decree for abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *Gainous v. Gainous*, 219 S.W.3d 97, 103 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *In re Marriage of McDonald*, 118 S.W.3d 829, 832 (Tex. App.—Texarkana 2003, pet. denied). "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

In family-law cases, the abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *See Zeifman v. Michels*, 212 S.W.3d 582, 587-88 (Tex. App.—Austin 2006, pet. denied). Consequently, legal and factual insufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Id.* at 587. To determine whether the trial court has abused

11

its discretion, we engage in a two-pronged inquiry, analyzing whether (1) the trial court had sufficient evidence upon which to exercise its discretion and (2) the trial court erred in its application of that discretion. *Id.* at 588.

Traditional standards for legal and factual sufficiency come into play with the first question. *Id.* When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). When a party attacks the legal sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When conducting a factual-sufficiency review, we consider all the record evidence and set aside the trial court's order only if the evidence is so weak as to make the order clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). "When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chemical Co.*, 46 S.W.3d at 242. We defer to the factfinder's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Because the trial court acts as the factfinder in a bench trial, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

The trial court does not abuse its discretion if it bases its decision on conflicting evidence or when some evidence of a probative or substantive character exists to support its

12

decision. *Zeifman*, 212 S.W.3d at 587. However, a trial court has no discretion to incorrectly analyze or apply the law, and its failure to analyze or apply the law correctly is an abuse of discretion. *See Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

## DISCUSSION

**Modification**

In his first and second issues, Dillon challenges the district court's modification order. In his first issue, Dillon asserts that the district court abused its discretion in finding that there was no material or substantial change in circumstances sufficient to justify modifying conservatorship in the manner requested by Dillon. In his second issue, Dillon contends that the district court abused its discretion by making other changes to the terms of conservatorship that were not supported by the evidence.

A trial court can modify the terms of a conservatorship order if (1) the children's or parties' circumstances have materially and substantially changed since the order was rendered and (2) doing so would be in the children's best interest. *Abila v. Miller*, 683 S.W.3d 842, 847 (Tex. App.—Austin 2023, no pet.) (citing Tex. Fam. Code § 156.101(a)(1)). "In a conservatorship modification action, a threshold inquiry of the trial court is whether the moving party has met the burden imposed upon him of showing a material and substantial change; otherwise the trial court must deny the motion to modify." *Zeifman*, 212 S.W.3d at 589. "To prove that a material change in circumstances has occurred, the petitioner must demonstrate what conditions existed at the time of the entry of the prior order as compared to the circumstances existing at the time of the hearing on the motion to modify." *Id.* In other words, the petitioner

must show what material changes have occurred in the intervening period. *Id.* "Although courts have allowed changes to be proved in a variety of ways, they have consistently required that a change be proved and that it be shown to be substantial and material." *Id.* at 593. "The policy behind the requirement of a material and substantial change is to prevent constant relitigation with respect to children." *Id.* at 595. "The requirement of this showing 'serves a valid purpose of significantly limiting the trial judge's discretion and prevents the modification statute from being unconstitutionally broad.'" *Id.* (quoting *In re M.N.G.*, 113 S.W.3d 27, 33 (Tex. App.—Fort Worth 2003, no pet.)).

"In determining whether a material and substantial change of circumstance has occurred, the factfinder is not limited by rigid or definite guidelines; rather, the determination is fact-specific and must be determined by the circumstances as they arise." *Arredondo v. Betancourt*, 383 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Material changes may include the marriage of one of the parties, poisoning of a child's mind by one of the parties, change in the home surroundings, mistreatment of a child by a parent or stepparent, or a parent's becoming an improper person to exercise custody. *Id.* at 734-35. "Additionally, a course of conduct pursued by a managing conservator that hampers a child's opportunity to favorably associate with the other parent may suffice as grounds for redesignating managing conservators." *Id.* at 735. "A material and substantial change in circumstances may be established by either direct or circumstantial evidence." *Id.*

We cannot conclude on this record that the district court abused its discretion by finding that Dillon failed to satisfy his burden to prove that there had been a material and substantial change in circumstances. Although it was undisputed that there was conflict between the parents following the divorce, Dillon provided no evidence that this conflict was materially

14

and substantially different than the conflict that existed between the parties at the time of the divorce decree. The burden was on Dillon to show the extent to which the conflict between the parents had intensified over the years, and the district court would not have abused its discretion in finding that Dillon failed to do so. As the district court correctly observed when announcing its ruling, "It's not enough to show there's been a change in circumstances, it has to be a material and substantial change in circumstances."

As for Dillon's claims that Bamford was inadequately coparenting with him, neglecting her parental duties, and disparaging him around the children, Bamford provided testimony to the contrary that the district court as factfinder was entitled to credit. Bamford testified that there were times when she and Dillon were able to work together and communicate regarding the children, that she took the children to birthday parties and play dates, and that she never cursed or bad-mouthed Dillon in front of the children. Although Bamford acknowledged that Dillon handled most of the children's dental appointments, she denied neglecting the children's hygiene, and she also testified that with orthodontic and ENT visits, both she and Dillon have "taken them but especially recently I've taken them on almost all of the ortho and ENT." She added, "We've equally taken them to therapy, speech therapy. Sick visits I take them on my weeks if something happens, an accident happens and they need to go to the doctor while with me, I take them, things like that." The district court would not have abused its discretion in believing Bamford's testimony.

Dillon also testified that there were safety issues at Bamford's home, and Bamford acknowledged some instances when the children were put at risk in her care, including a time when Kristen had consumed Bamford's Delta-8 gummies. However, the guardian ad litem testified that he had investigated these issues and concluded that although "there are some

15

things that are concerning," there was "nothing in [his] mind that would rise to the level of needing any kind of dramatic change to these schedules for these kiddos." He added, "I'm not seeing anything in my view that would warrant a change based on safety. I think there are opportunities at both parents' houses to suffer injuries, to be frank." Additionally, in his written report, the guardian ad litem opined that "[b]oth Mr. Dillon and Ms. Bamford very clearly love their children" and that both are "highly involved and active parents who take a keen interest in their children's education and activities." Because of that, he did not "recommend any change to the current possession schedule" and "would not recommend a change to the rights and duties at this time," except for giving Dillon the exclusive right to vaccinate the children.[3]

On this record, we cannot conclude that Dillon conclusively established that there was a material and substantial change in circumstances or that the district court's finding that there was not a material and substantial change in circumstances was against the great weight and preponderance of the evidence. Thus, the district court's finding was supported by legally and factually sufficient evidence, and based on that evidence, the district court did not abuse its discretion in denying Dillon's requested modification to be named joint managing conservator with the exclusive right to designate the primary residence of the children and to serve as the "tie breaker" in the event that he and Bamford could not agree on decisions relating to the children's care and education.

Dillon further asserts that Bamford judicially admitted that there was a material and substantial change in circumstances by filing a counterpetition to modify in which she included an allegation that there had been a material and substantial change in circumstances.

---

[3] The district court did not make this modification, finding that the parents had agreed to not vaccinate the children at the time of the divorce decree.

However, the record reflects that Bamford did not argue this at the hearing and instead argued that the orders should "remain as they currently are." *Cf. Filla v. Filla*, No. 03-14-00502-CV, 2016 WL 4177236, at \*4 (Tex. App.—Austin Aug. 5, 2016, pet. denied) (mem. op.) ("[Appellant] filed a counterpetition to modify the previous custody order and proceeded on that pleading at the jury trial."). Dillon did not object to Bamford's change in position at trial or even mention her counterpetition, and by failing to do so, he has waived this complaint on appeal. *See Houston First Am. Sav v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983) ("The party relying on his opponent's pleadings as judicial admissions of fact, however, must protect his record by objecting to the introduction of evidence contrary to that admission of fact and by objecting to the submission of any issue bearing on the fact admitted."); *id.* at 768 ("Assuming for the sake of argument that . . . [appellee's] pleadings do admit [a disputed fact], [appellant] has nevertheless waived its right to rely on the admission."); *see also Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989) ("We hold that a party waives the right to rely upon an opponent's deemed admissions unless objection is made to the introduction of evidence contrary to those admissions."); *Tony's Concrete Work, LLC v. Goad*, No. 01-23-00759-CV, 2024 WL 3528443, at \*10 (Tex. App.—Houston [1st Dist.] July 25, 2024, pet. denied) (mem. op.) ("Because [appellant] did not raise the judicial admission argument in the trial court, he is precluded from raising it now for the first time on appeal."); *DePriest v. DePriest*, No. 14-20-00032-CV, 2022 WL 2205281, at \*3 (Tex. App.—Houston [14th Dist.] June 21, 2022, pet. denied) (mem. op.) (concluding appellant waived right to rely on appellee's judicial admission regarding disputed property in divorce by declining to object to evidence contrary to admission).

We overrule Dillon's first issue.

Regarding the district court's modifications to conservatorship that were not requested by Dillon, his specific complaints on appeal are limited to the district court's modifications that Bamford have the exclusive right to consent to the psychiatric and psychological treatment of the children and that the children remain in therapy with their therapist.[4] He argues that neither modification is supported by the evidence.

We agree. Regarding the modification granting Bamford the exclusive right to consent to the psychiatric and psychological treatment of the children, there was no evidence of any material and substantial change in circumstances sufficient to warrant that change, nor was there any evidence to support a finding that such a change would be in the best interest of the children. In his report, the guardian ad litem stated that he was "encouraged that there do not appear to be any major disagreements between the parents related to invasive medical procedures, *psychological or psychiatric decisions*, or educational decisions at this time." (emphasis added). He added, "And both parents have given me examples of how they have been able to resolve disputes between themselves." As a result, he "would not recommend a change to the rights and duties at this time." In his testimony, the guardian ad litem amended his report to clarify that "the parents should both make sure" that the children attend therapy and that "to the extent that we need a tiebreaker in this case, it is going to be therapy and that if the parents are not able to agree, that that should go to mom." However, at no point did he testify that Bamford should have the exclusive right to consent to the children's psychiatric and

---

[4] Although Dillon mentions in his statement of facts the district court's modifications placing limitations on the rights of the parents to enroll their children in extracurricular activities and requiring that each parent read the book "BIFF for Co-Parent Communication," he makes no argument as to how those modifications are not supported by the evidence or an abuse of discretion. Accordingly, to the extent Dillon challenges those modifications, we conclude that they are inadequately briefed. *See* Tex. R. App. P. 38.1(i).

18

psychological treatment, and neither Dillon nor Bamford provided any testimony from which the district court could reasonably infer that it would be in the best interest of the children for Bamford to have that right.

We reach the same conclusion regarding the modification that the children remain in therapy with their therapist at the frequency and duration recommended by the therapist. There was insufficient evidence from which the district court could reasonably infer that there had been a material and substantial change in circumstances to justify that requirement. The guardian ad litem testified that the children needed to remain in therapy and that they had missed appointments with their therapist beginning in November 2024 and continuing through March 2025 while they were in Dillon's care due to a billing dispute that Dillon had with the therapist. However, there was no testimony explaining why a change in frequency and duration of the children's therapy was needed or why it would be in the children's best interest for the children's therapist to choose the frequency and duration of the therapy rather than the children's parents. We conclude that the district court abused its discretion by modifying conservatorship to include that requirement.

We sustain Dillon's second issue.

**Enforcement**

In his third and fourth issues, Dillon challenges the trial court's enforcement order. In his third issue, Dillon argues that the district court erred in awarding him the right to claim the children as dependents in 2026, rather than awarding him the amount that he would have received if Bamford had not improperly claimed the children in 2019. In his fourth issue, Dillon asserts that the district court erred in finding that there was insufficient evidence to

19

support his claim that Bamford violated the decree by claiming the children as tax dependents in 2021.

"To promote amicable settlement of disputes in a suit for divorce or annulment, the spouses may enter into a written agreement concerning the division of the property and the liabilities of the spouses and maintenance of either spouse." Tex. Fam. Code § 7.006(a). This includes agreements related to federal tax liability and exemptions. *See Durden v. McClure*, 281 S.W.3d 137, 139-42 (Tex. App.—San Antonio 2008, no pet.). "The court that rendered the decree of divorce or annulment retains the power to enforce the property division as provided by Chapter 7, including a property division and any contractual provisions under the terms of an agreement incident to divorce or annulment under Section 7.006 that was approved by the court." Tex. Fam. Code § 9.002. However, "[a] court may not amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment." *Id.* § 9.007(a). "An order to enforce the division is limited to an order to assist in the implementation of or to clarify the prior order and may not alter or change the substantive division of property, *id.*, and any such order "is beyond the power of the divorce court and is unenforceable," *id.* § 9.007(b).

Additionally, "[t]he question of income tax exemptions is an area of federal law that has preempted state law and must be determined according to applicable federal statutes." *In re S.L.M.*, 293 S.W.3d 374, 375 (Tex. App.—Dallas 2009, no pet.) (citing *In re J.G.Z.*, 963 S.W.2d 144, 150 (Tex. App.—Texarkana 1998, no pet.)). "When a person is entitled to a federal income tax exemption, the trial court may not take it away." *Id.* (citing *In re C.C.N.S.*, 955 S.W.2d 448, 450 (Tex. App.—Fort Worth 1997, no pet.); *Lystad v. Lystad*, 916 S.W.2d 617, 618 (Tex. App.—Fort Worth 1996, no pet.)); *see also Cafarelli v. C.I.R.*, 67 T.C.M. (CCH) 3077 (T.C. 1994) ("State courts, by their decisions, cannot determine issues of Federal tax law.").

Federal law permits divorced parents to agree that they will claim their children as dependents in certain taxable years and not claim them in other taxable years. *See* 26 U.S.C. § 152(e)(2)(A). When such an agreement is contained within an agreed divorce decree, a trial court is generally required to treat the decree as a consent judgment and enforce the agreement as written. *See Durden*, 281 S.W.3d at 139-42.

Here, the agreed divorce decree awarded Dillon "the sole right to claim the children as dependents for income tax purposes on [his] income tax returns for odd-numbered years beginning with the calendar year 2019." The decree similarly awarded Bamford "the sole right to claim the children as dependents for income tax purposes on [her] income tax returns for even-numbered years beginning with the calendar year 2020." It is undisputed that Bamford improperly claimed the children for 2019. Accordingly, Dillon was entitled to the amount that he would have received for that year, specifically $8774 as shown by the undisputed testimony from Mangold. The decree did not allow Dillon to claim the children in 2026, an even-numbered year, and the district court abused its discretion in concluding otherwise.

We sustain Dillon's third issue.

Regarding the 2021 taxes, we cannot conclude that the district court abused its discretion. Bamford testified that she did not claim the children for that year, and Dillon presented no contrary evidence. Mangold testified that Dillon was deprived of tax benefits that year not because Bamford improperly claimed the children as dependents but because she failed to follow "IRS guidance requiring her to return money to the IRS and release her claim for exemption." We agree with the district court that Dillon failed to prove that the IRS's denial of benefits to him in 2021 was the result of Bamford violating the divorce decree.

We overrule Dillon's fourth issue.

21

**CONCLUSION**

We affirm in part and reverse and render in part the district court's modification order. We affirm the portion of the order denying Dillon's petition to modify. We reverse the portions of the order specifying that Bamford have the exclusive right to consent to the psychiatric and psychological treatment of the children and that the children remain in therapy with their therapist. We render judgment deleting those modifications.

We affirm in part and reverse and render in part the district court's enforcement order. We affirm the portion of the order providing that Dillon shall receive no award for the alleged acts by Bamford related to Dillon's 2021 taxes. We reverse the portion of the order providing that because Bamford incorrectly claimed the children on her taxes for 2019, Dillon is to claim the children on his tax return for the year 2026. We render judgment that because Bamford incorrectly claimed the children on her taxes for 2019, Dillon is to be awarded the amount that he would have received for that tax year if Bamford had not incorrectly claimed the children, specifically $8,774.00.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed in Part, Reversed and Rendered in Part

Filed: April 30, 2026

22